Karl F. RITZ et al., Appellants,

v.

J. J. O'DONNELL et al.

No. 76–1524.

United States Court of Appeals, District of Columbia Circuit.

Argued April 1, 1977.

Decided Sept. 6, 1977.

As Amended Oct. 6, 1977.

Rehearing Denied Oct. 4, 1977.

---

**21.** *See* 49 U.S.C. § 5(15) (1970).

J. Gordon Forester, Jr., Washington, D. C., for appellants.

Gary Green, Washington, D. C., with whom Daniel M. Katz, Washington, D. C., was on the brief, for individual defendants-appellees.

Donald J. Capuano, Washington, D. C., with whom Patrick C. O'Donoghue and Robert Matisoff, Washington, D. C., were on the brief, for appellee, Air Line Pilots Association, International. Glenn V. Whitaker, Washington, D. C., also entered an appearance for appellee, Air Line Pilots Association, International.

Before TAMM, LEVENTHAL and MacKINNON, Circuit Judges.

Opinion for the court filed by LEVENTHAL, Circuit Judge.

Dissenting opinion filed by MacKINNON, Circuit Judge.

LEVENTHAL, Circuit Judge:

Plaintiff Ritz was charged with misconduct by his union, the Air Line Pilots Association (ALPA). With one exception, the union's Hearing Board dismissed all the charges against Ritz.[1] The Board found Captain Ritz guilty of "disobeying or failure to comply with a decision of the ALPA Board of Directors." Specifically, the Hearing Board found that subsequent to the merger of Northeast Airlines with Delta Airlines, Ritz, then chairman of the Northeast Airlines Master Executive Council (MEC),[2] wilfully refused to report to ALPA funds which had been collected from Northeast's pilots for the NEA Master Executive Council Legal Fund.[3] ALPA had repeatedly requested that Ritz supply the home office with the information, which was needed to file a report required by the Labor Department (LM–2 report).[4] Ritz eventually supplied the information directly to the Labor Department, and sent a copy of the report to the ALPA home office.

The decision of the Hearing Board was sustained by ALPA's Appeal Board, which assessed a $500 fine against Captain Ritz. He then brought this action in the district court seeking to enjoin ALPA and its officers from enforcing the decision of the Appeal Board. Captain Ritz contended, *inter alia*, that he was denied a "full and fair hearing" as required by section 101 of the Labor-Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. § 411; that the disciplinary action was instituted in retaliation for his opposition to the policies of

1. At the same time, the Hearing Board also dismissed all the related charges against nine other pilots, who are also named as plaintiffs in this case. Since their alleged injury is less than that of Captain Ritz, our disposition of his case also applies to them. For convenience, we will refer to plaintiff in the singular.

2. The Master Executive Council is the union's administrative arm at each airline. Each pilot group elects its own MEC on an airline-by-airline basis.

3. The funds were collected both before and during Ritz's term as chairman. However, since he was the last chairman, the records indicating the amounts collected were in his possession.

4. In 1971, pursuant to a consent order with the government, *Ruby v. Hodgson*, Civil Action No. 1104–70 (D.D.C. Aug. 9, 1971). ALPA instituted procedures requiring the MECs to provide the home office with the information necessary to file the LM–2 reports. While plaintiff challenges the validity of the consent decree, that issue is not now before us. It is clear that ALPA could require the MECs to report to the home office, and Ritz violated a valid union regulation.

the union's leadership; and that there was insufficient evidence to sustain the decision of ALPA's Appeal Board. The district court rejected these allegations and granted summary judgment for the defendants. *Ritz v. O'Donnell*, 413 F.Supp. 1365 (1976). For the reasons discussed below, we affirm the decision of the district court.

## I. ALLEGED DENIAL OF A FAIR HEARING

The charging parties, the individual defendants in this action, did not appear at either the Hearing or Appeal Board proceedings.[5] The plaintiff alleges that this prevented him from exercising his right of confrontation and cross-examination, and thereby denied him the "full and fair hearing" he was entitled to under section 101(a)(5)(C) of the LMRDA, 29 U.S.C. § 411(a)(5)(C).

While section 101(a)(5)(C) prohibits the disciplining of any member by a union unless he is afforded a "full and fair hearing", the member need not necessarily be provided with the full panoply of procedural safeguards found in criminal proceedings. *Tincher v. Piasecki*, 520 F.2d 851, 854 (7th Cir. 1975). In determining whether a full and fair hearing has been afforded a member, the "fundamental and traditional concepts of due process" serve as the basis for decision. *Tincher v. Piasecki, supra; Parks v. International Brotherhood of Electrical Workers*, 314 F.2d 886, 912 (4th Cir.), cert. den., 372 U.S. 976, 83 S.Ct. 1111, 10 L.Ed.2d 142 (1963). The courts have uniformly recognized that the right of confrontation and cross-examination of witnesses is fundamental to the "full and fair hearing" requirement, *Parks v. IBEW, supra*. They have also uniformly declared that union members who knowingly fail to exercise rights guaranteed or offered them in connection with union disciplinary proceedings have waived those rights. Indeed, even under the more stringent procedural due process standards applicable to criminal proceedings, the courts have held that the right to confront and cross-examine witnesses may be waived. *Taylor v. United States,,* 414 U.S. 17, 19–20, 94 S.Ct. 194, 38 L.Ed.2d 174 (1973).

We agree with the district court that in this case the plaintiff did waive his right of confrontation. The charging members were not present—apparently due to other union business. But the Hearing Board repeatedly stated in the presence of the accused, the plaintiff here, that he had the right to call for the appearance of the charging parties and to examine them.[6] Captain Mudd, the representative of the charging parties, offered several times to produce for cross-examination any persons requested by plaintiff. Each time plaintiff indicated, expressly or tacitly, that he was not making any such request, even though he stated his awareness of his right to do so.[7]

Plaintiff did request that he be permitted to cross-examine his accusers before ALPA's Appeal Board, but his request was denied. The ALPA Constitution specifically permits the Appeal Board to determine

---

5. As permitted by the ALPA Constitution, the charging parties were represented by another individual, Captain David Mudd. The charging parties' entire case against Captain Ritz consisted of written documents.

6. In this regard, the following statement by one of the members of the Hearing Board is particularly noteworthy. "We have been sort of waiting, I think, for someone to suggest that their accuser be here to face them, but nobody seems to want to do it."

7. Before the Hearing Board, plaintiff Ritz stated:

Mr. Mudd just said that there had been a request from the Charging [*sic*] Party, and no Charging [*sic*] Party requested that the national officers be here—of this group, either those that I represent that are not here, nor this group that are here. Now, if the Board made such a request that Mr. Mudd heard, that is between you·and him, *but no Charging [sic] Party,—or Charged Party made such a request, and Jack McWalter [one of the charged parties] summed that up quite adequately in his closing comments, as to our position.* (Emphasis added).

Transcript of proceedings before the ALPA Hearing Board, January 21–24, 1975 at 3–158 to 3–159, J.A. 221–22.

appeals solely upon the record submitted to it by the Hearing Board. That is the rule of appellate procedure followed by appellate courts, and is entirely congruent with fair procedure. Given Ritz's repeated failure to exercise his right of confrontation at the hearing level, his claim of denial of a right of confrontation at the appeal is without merit.

■ Finally, even if plaintiff's course did not constitute a waiver of his right of confrontation and cross-examination, we conclude that on the facts of this case he was not denied any right essential to or implicit in the statutory requirement of a full and fair hearing by the union. What is frequently characterized as "the right to confront one's accusers" is, in essence, the right to examine or cross-examine the pertinent *witnesses. See Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). A person does not have the right to question those who filed charges against him. Those charges may have been based on responsible hearsay, rather than the direct knowledge of the charging party. If the charging party, or his counsel, presents witnesses or other evidence at the proceeding, and the respondent is offered both full opportunity to test the validity of that evidence and the opportunity to call the charging persons as witnesses (even as hostile witnesses) in the event he thinks there testimony will help his case, a full and fair hearing is assured. Here the entire case against Captain Ritz was proven by written documents, the authenticity of which Ritz conceded; there were no witnesses for him to cross-examine; and there is no suggestion of any claim made that he had any request or need to call the accusing parties in order to present some kind of affirmative defense.

## II. REPRISAL ALLEGATIONS

■ Plaintiff also asserts that the disciplinary proceedings violated section 609 of the LMRDA, 29 U.S.C. § 529, because they were instituted as a reprisal for plaintiff's opposition to the policies of ALPA's leadership. Section 609 clearly prohibits a union from penalizing its members because they have exercised their rights of free speech and assembly, and the courts have not hesitated to nullify disciplinary actions that have infringed upon those rights. *Kuebler v. Cleveland Lithographers and Photoengravers Union Local 24–P,* 473 F.2d 359 (6th Cir. 1973). In the instant case, however, plaintiff has failed to make even a minimal showing that the disciplinary proceedings were instituted as a retaliatory measure. It was, therefore, proper for the district court to grant summary judgment for the defendants.

■ In support of his claim of reprisal, plaintiff calls attention to the fact that twenty-three other LM–2 reports were not filed with the Labor Department at the time charges were instituted against him. Charges were not brought against these other twenty-three chairmen, and this, the plaintiff argues, indicates he was "singled out" in an impermissible attempt to punish him for his opposition to the union's leadership. However, Ritz was not disciplined for failure to file the LM–2 with the Labor Department, but for failure to comply with an ALPA order specifically directing him to supply the union with the data that it needed so it could file the report. There is no evidence that the other twenty-three chairmen refused to supply information to ALPA.

## III. SUFFICIENCY OF THE EVIDENCE

■ Plaintiff contends that there is no evidence showing it was the policy of ALPA, or that he knew it was the policy of ALPA, to file the LM–2 reports with the Labor Department through the home office rather than directly from the Master Executive Councils. Conviction by a union on charges unsupported by any evidence violates the full and fair hearing requirement of the LMRDA. *International Brotherhood of Boilermakers v. Hardeman,* 401 U.S. 233, 246, 91 S.Ct. 609, 28 L.Ed.2d 35 (1971). However, the Supreme Court has held that in reviewing union disciplinary proceedings, the courts are limited to deciding whether

there is "some evidence" to support the charges made. *Boilermakers, supra* at 246, 91 S.Ct. 609. There is no requirement of "substantial evidence." The limited judicial role staked out by the Supreme Court for these cases leads us to affirm the conclusion of the district court that the union met its burden of producing some evidence to support the charges against Ritz.

■ In 1971, pursuant to a consent order with the government, *Ruby v. Hodgson*, Civil Action No. 1104–70 (D.D.C. Aug. 9, 1971), ALPA instituted procedures requiring the Master Executive Councils to provide the home office with the information necessary to file the LM–2 reports. The consent order clearly permits ALPA to require that the LM–2 reports be filed from the home office. There is evidence in the record that the ALPA Board specifically informed Ritz of the requirement that he supply the information to the home office.

## IV.  DISQUALIFICATION ALLEGATION

Plaintiff charges error in the proceedings against him in the failure of two members of the Appeals Board to disqualify themselves by reason of the Board's rule "that a member disqualify himself in any case involving pilots of his own airline." (J.A. 479) The two members were employed by the same airlines as two of the charging parties, officers of ALPA at the time charges were brought against plaintiff. The purpose of the rule appears to be to avoid any possibility of bias in favor of a party with whom one is acquainted and may have worked. The two charging parties were no longer officers of ALPA at the time of the appeal (J.A. 486), and any involvement was nominal.

■ Plaintiff has made no attempt to show actual prejudice from the composition of the Appeals Board, so we must construe the argument as one of inherent prejudice.[8] The statutory test for this claim is whether plaintiff got a "full and fair hearing," not whether the Appeals Board abided by the literal words of its own rules. By this standard and the doctrine of harmless error, we conclude that plaintiff was not deprived of a "full and fair hearing" by the failure to disqualify in these circumstances.

## V.  CONCLUSION

■ We end with a summary that will also serve to take account of points raised in the dissenting opinion. Plaintiff's role in the dispute with ALPA promotes sympathetic consideration of his appeal for judicial relief. He was a leader of an insurgency against the national union and in emotional terms the union's sanction became exposed to the challenge that it was retaliation. However, the recourse to the Hearing Board and Appeals Board provided by the ALPA Constitution yielded substantial victories to plaintiffs in these forums. Moreover, the courts are subject to restraint, to the clear import of *Boilermakers* that in this field of law the courts have a distinctly narrower supervisory role over union disciplinary proceedings than over agency proceedings, and a fortiori than criminal proceedings.[9] We must scrutinize the procedures, but intervene only if there has been a breach of fundamental fairness.

Plaintiff had an acrimonious dispute with the ALPA national leadership. Charges were brought against plaintiff in connection with the financing of the fight against

---

**8.** Current developments in federal judicial recusals have departed from the one time rule that disqualification was required only in case of a "substantial" interest, and what is now contemplated is utmost punctilio. The rule of fundamental fairness governing union proceedings is not violated by the kind of minor, formal involvement of the two charging parties.

**9.** That the scope of review is limited appears clearly from the rule requiring affirmance if the

record contains "some evidence," *International Brotherhood of Boilermakers v. Hardeman*, 401 U.S. 233, 246, 91 S.Ct. 609, 28 L.Ed.2d 10 (1971), even though this is less than the "substantial evidence" required to affirm an administrative agency acting by formal rulemaking or adjudication, 5 U.S.C. § 706(2)(E). The appellate court's scope is of course less for review of agency proceedings than for review of judgments in civil and criminal cases.

ALPA. The Hearing Board, while troubled by the absence of the charging parties, gave consideration to all contentions, including plaintiff's and the evidence presented. It dismissed all charges against plaintiffs except for finding plaintiff Ritz guilty of refusal to file required financial information. It required pro rata reimbursement of the unexpended litigation funds and other actions on pain of expulsion from ALPA. The Appeals Board likewise considered plaintiff's contentions, affirmed the Hearing Board's finding of guilt on the refusal to file reports, and reduced the penalty to a $500 fine.

The dissent stresses the failure of the charging parties to appear either before the Hearing Board or the Appeals Board notwithstanding the fact that the case against the plaintiff was based in its entirety on documents whose authenticity was unchallenged. The union constitution explicitly permits a charging party to be represented by another member.[10]

The presence of the charging parties was discussed several times during the four days of hearings in January, 1975. Plaintiff was clearly aware of the issue and its possible significance for his defense. There was ample opportunity for consultation with counsel during recesses (J.A. 435) and between sessions. When plaintiff finally addressed the matter, he made it clear that he had decided not to request the presence of the charging parties. Perhaps he did not want the onus of bringing the national officers to Boston at a time when there was a flurry of activity going on in Washington, D.C. in connection with ALPA's boycott of hazardous materials (J.A. 447). In any event, plaintiff took a deliberate position.

While the Appeals Board may receive additional evidence, what is involved here is not new or subsequently discovered evidence, but rather evidence that plaintiff, for whatever reason, decided not to demand. In view of our limited review function, we can hardly find an abuse of discretion by the Appeal Board.

The dissent argues that since the union's rule for appeals prohibits cross-examination of a party, this is tantamount to a denial of a fair hearing in a case that requires the testimony of a charging party. This point was not argued by counsel. Indeed appellants' counsel does not even cite the rule which the dissent italicizes, though a number of other rules are invoked.[11] This does not signify inattention by counsel, but rather a mis-reading of the rule by the dissent. What the rule means is that there is to be no cross-examination of an individual simply because he is a party. Obviously, if he is a witness, and gives testimony that is material, he would be subject to cross-examination. This court would be the first to join the stream of citations in appellants' brief (pp. 12–13) to the effect that a fair hearing includes "the right to confront and cross-examine witnesses," *e. g., Parks v. Int'l Brotherhood of Electrical Workers*, 314 F.2d 886, 912 (4th Cir.) *cert. denied*, 372 U.S. 976, 83 S.Ct. 1111, 10 L.Ed.2d 142 (1963).

Here, the individuals who signed the charges were not witnesses in support of the charges, the appellants expressly refused to call them as (hostile) witnesses in resisting the charges, and that, in our view, is the end of the matter. The same condition prevailed even later, at the hearing of the appeals board, when Ritz—who had already procured the aid of counsel in the District Court proceeding—not only failed to submit evidence by September 15, 1975, the date set by the Board's letter a month previous, but made it clear that he was calling for the appearance of the individuals

---

10. ALPA Constitution, Art. VIII, § 3.D (J.A. 457):

> Both the accused member and the accuser shall have the right, both at the original hearing and at any appeal taken therefrom, to designate and be represented by an active member of the Division in good standing.

11. Section I.C of appellants' brief ("Procedural Violations before the Appeal Board"), makes a number of other points, including claims of violations of Rules D and F of the Rules of the Appeal Board, and of Sections 3D, 4C and 7B of Article VIII of the Constitution and Bylaws of the union.

concerned not as witnesses but as "accusers."[12]

We stress again that this was not a judicial or even agency proceeding, it was a union proceeding and the courts are not to interfere except on a kind of showing of grievous unfairness that is entirely lacking in this case.

*Affirmed.*

MacKINNON, Circuit Judge, dissenting:

The basic controversy between the parties here is an outgrowth of the merger of Northeast Airlines (Northeast) and Delta Airlines (Delta). As originally brought, the charges involved the resulting seniority rights of appellant Ritz and a number of other Northeast airline pilots. To say that these pilots were disappointed with the job seniority list that was decreed to them in the operating air line that resulted from the merger is to put it mildly. A number of pilots engaged in the direct attack on the seniority list but Ritz was the only pilot who was found guilty of anything and punished for his acts that were an outgrowth of their opposition to the union leadership. He appeals and in my opinion *his* complaint has merit.

I

The merger between Northeast and Delta was approved on May 17, 1972 and one result was the integration of the seniority lists of the flight deck crews of both airlines. The Northeast pilots objected to the seniority they obtained in the resulting list.

Their objections were spearheaded at first by their Northeast Master Executive Council (MEC), which was the name given to the labor organization of Northeast pilots all of whom were members of the Airline Pilots Association (ALPA), the national union. The local MEC was an organizational substructure of the national ALPA.

To secure the seniority right to which they considered they were entitled the members of the Northeast Master Executive Council instituted several legal actions attacking the validity of the merged seniority list.[1] Appellant Ritz and other members who were the plaintiffs in this original action were all members of the Northeast Master Executive Council (MEC). Ritz was chairman of the MEC until it was abolished on November 21, 1972. To press their rights independently of the union, Ritz and his MEC associates eventually organized a non-profit corporation, the Unified Pilots Society for Equitable Treatment, Ltd. (UPSET). Through this organization the Northeast pilots collected funds from other Northeast pilots to finance the fight of all Northeast pilots to regain their lost seniority rights. Their contention was that their bargaining representative (the Union ALPA) had failed them in its statutory and contractual obligations. The charges that were thereafter brought against the Northeast pilots by several officers of ALPA admits that funds were expended by the Northeast pilots for "legal services in connection with [designated] litigation"[2] seeking to have "the court or agency involved

---

12. Captain Ritz's letter of Sept. 12, 1975 (J.A. 477) called for the appearance of Flack, Shaughnessy and Miles as "witnesses," and separately demanded "that all of my accusers, J. J. O'Donnell, A. Bonner, Wm. Davis and J. Giberson, be present at the hearing." There was no indication of what evidence, if any, was sought, or even hoped, to be elicited from these "accusers."

1. As detailed in the charges brought against the Northeast Pilots these legal actions were four in number:

   (a) *Northeast Pilots MEC v. O'Donnell and ALPA,* Civil Action No. 1911–72 (District Court, District of Columbia), Complaint filed

September, 1972, dismissed October 1972;

   (b) *Petition* by NEA–MEC for exercise of jurisdiction by the Civil Aeronautics Board in *Delta-Northeast Merger Case,* filed October 1972, dismissed January 1973;

   (c) *Carey et al. v. O'Donnell and ALPA,* Civil Action No. 609–73 (District Court, District of Columbia), Complaint filed April 1973, dismissed May 1, 1973;

   (d) *Chaudoin et al. v. ALPA and Delta,* Civil Action No. 752–73 (District Court, District of Columbia) Complaint filed April 1973; ALPA Motion to Dismiss pending. (J.A. 27).

2. *Id.*

. . . invalidate the June 1972 seniority list. In all of these proceedings, the MEC had knowingly approved and authorized the necessary expenditures from the [Northeast] Legal Fund" (J.A. 27). These lawsuits pitted the pilots directly against their national union. As an outgrowth of the pilots' activities to regain seniority, several officers of ALPA brought charges against the Northeast pilots who had been members of the MEC for Northeast (NEA–MEC) (J.A. 22–30).

The pilots contended that the only purpose of the disciplinary action against them was to gain control of the Northeast Pilots Legal Representation Fund. This fund was solicited by Northeast pilots from Northeast pilots.[3] According to the pilots that are here charged, the payments into the fund were voluntary as to each pilot and no compulsory procedures of the union constitution or by-laws were ever utilized. The pilots contend that they had a clear right to solicit funds in order to protect their seniority rights by actions inside and outside the union. That union members may press their rights in the union and by subsequent lawsuits is implicitly recognized by the ALPA constitution which provides that members may be disciplined for "Initiating legal action against [ALPA] . . . *before* exhausting all remedies provided in this constitution and By-Laws" (J.A. 456, emphasis added). The charges brought against the Northeast pilots admits that they first protested their treatment to ALPA's president and then to the ALPA Board of Directors, without securing any modification; and also "challenged the va-

lidity" of the election dissolving the NEA–MEC (J.A. 23). These protests may have exhausted their intra-union remedies or demonstrated the futility of further appeal.

On May 25, 1973, O'Donnell, the President of ALPA, and the three other principal officers of ALPA (hereafter "charging parties") (J.A. 22–30), formally charged the entire MEC Board, including Ritz, with acting "contrary to the best interests of [ALPA or its members]" (J.A. 30).

The complaint of the charging parties was extensive and was directed primarily against the use of the fund that the Northeast pilots had solicited in an effort to support their seniority claims. Paragraph 23 is an example:

> By acts described in paragraphs 8, 10, 11, 12 and 17, the MEC and its agents have collected funds from other ALPA members by use of false and misleading statements designed to suggest that such ALPA members were obliged to contribute, although ALPA members were and are not, in fact, required to sponsor activities like those conducted by the MEC.

(J.A. 28).

The concluding charges against the members of the NEA–MEC (including Ritz), alleged:

> Because of your position and role as a member of the NEA–MEC at all relevant times, and your active and knowing approval of and participation in all of the activities described above in paragraphs 13 through 19, inclusive, you are hereby charged with acting in a manner to circumvent, defeat or interfere with collec-

---

**3.** The majority treats the failure of the Northeast MEC to report financial data to ALPA upon demand as though it were an independent incident of disobedience. In actuality, this withholding of information concerned the very funds that the Northeast MEC had raised for its legal attacks on ALPA. Hence, the majority gives an erroneous view of the circumstances when it says:

> However, Ritz was not disciplined for failure to file the LM–2 with the Labor Department, but for failure to comply with an ALPA order specifically directing him to supply the union with the data that it needed so it could file the report. There is no evidence that the

other twenty-three chairmen refused to supply information to ALPA. (Maj. op. at 736).

The important point is that ALPA chose to issue an order only to the Northeast MEC chief. While the majority is correct that "[t]here is no evidence that the other twenty-three chairmen refused to supply information to ALPA," there is also no evidence that they were *asked* to supply the information. And the order to Ritz was "specifically directing him to supply" information about precisely the activity he was carrying on to fight ALPA. This was not, as the majority opinion might lead one to believe, a matter of insubordinate failing to supply routine financial data.

tive bargaining between the Division and an employer or with existing collective bargaining agreements, within the meaning of Article VIII, Section 1(10) of the ALPA Constitution and By-Laws.

Because of your position and role as a member of the NEA–MEC at all relevant times, and your active and knowing approval of and participation in all of the activities described above in paragraphs 4, 5, 6, 8 and 10 through 19, inclusive, you are hereby charged with doing acts contrary to the best interests of the Association or its members within the meaning of Article VIII, Section 1(11) of the ALPA Constitution and By-Laws.

(J.A. 29–30).

An opening paragraph of the complaint also stated:

If the charges against you are sustained, the undersigned charging parties intend to request that the Hearing Board impose a fine of $7,500.00 upon you, and upon each other person similarly found guilty; upon the payment of such fines, the undersigned charging parties will arrange for the restoration to their lawful owners of all sums improperly diverted and misappropriated.

(J.A. 22).

From the complaint it was clear that the charging parties contended that the offenses of which the charged parties were guilty grew out of their being members of the Northeast MEC at the time they were trying to defend the seniority rights of Northeast pilots. In using the funds they collected the charges alleged that the charged parties "misappropriated funds of the Northeast Division of *ALPA*." (Emphasis added). In other words, the charge was that such funds belonged to ALPA and not to the pilots who raised them for their special purpose.

Immediately after the filing of the charges against them, the Northeast pilots on June 29, 1973 filed suit to enjoin the disciplinary proceedings brought against them. In their allegations the pilots contended that the proceedings were in *reprisal* for their attempt to regain some of their lost seniority. The District Court denied this injunction but conditioned its denial on a requirement that a stenographic transcript be kept of the union proceedings. It also sustained an objection raised by *counsel for ALPA* that respondents be denied the right to counsel at the hearing. However, shortly thereafter when the same counsel (not present counsel for ALPA)— "without any notice to the court—request[ed] that *he be permitted to appear [in the proceeding] as counsel for the charging parties," Ritz v. O'Donnell*, No. 73–2200 (U.S.App.D.C., filed Dec. 30, 1974), at 4 (emphasis added), the District Court amended its order to also permit *counsel* for the pilots to be present at the hearing. From that order the union took an interlocutory appeal to this court. In a rather lengthy unpublished memorandum opinion this court reversed the District Court on December 30, 1974 (No. 73–2200) and held that neither party could have legal counsel unless counsel was a union member. *Ritz v. O'Donnell, supra.*

II

Thereafter, commencing on January 21, 1975, the charges were heard by a Hearing Board of ALPA. At the beginning of the proceeding all the accused were present *without counsel* but none of the charging parties appeared. Instead the charging parties sent one Captain Mudd to act in their stead. Mudd, however, knew nothing about the matter and refused to be sworn. He went through the motions of presenting the charges against the Northeast pilots by merely reading excerpts from a number of documents with which he had no connection. No person attested to the truth of the documents yet they were all received in evidence by the Hearing Board. The charges against Ritz and the others were signed by O'Donnell and the three other national officers of ALPA yet *none of the four appeared for testimony or cross-examination.* At the conclusion of this charade of unsworn statements by an unqualified witness, after reading the documents, Mudd stated:

MR. MUDD: Gentlemen, you are going to have a problem, because the position I am in as the Charging Party, presenting the case, and I am not in a position, nor can I be in a position of being cross-examined as one of the Charging Parties here. I have presented the case. All of these charges that have been filed here and represented as true charges by the Charging Parties, there has been enough evidence found in these things, that have indicated that these men are guilty of these allegations to the charges, et cetera. Now, *Ihave* [sic] *presented the case for the Charging Parties, and it would be impossible for me to attest to the accuracy, to the exact time that they took place and what have you. I am not capable; nor can I do it.* (Emphasis added).

THE CHAIRMAN: Okay. Let the record show that the representative of the Association declined to be sworn in for the reasons so stated.

(J.A. 154).

At that juncture in the proceedings, appropriate motions were made by the charged parties that the charges be dismissed (J.A. 139, 157). The chairman, however, ruled that since the association could present rebuttal evidence some substantiation for the charges *might* be forthcoming. The unique theory has no support in the law and is a good example of the lack of fairness in the proceedings.

### III

A more substantial denial of a fair proceeding here is the failure to require or present O'Donnell to the hearing for examination and cross-examination. The Board's rule governing all proceedings listed as one item for each hearing:

Presentation of Evidence, if any, *by the Charging Party,* with the right of cross-examination by the Respondents.

(J.A. 139). No person has pointed to any place in the record where any of the charged parties waived compliance with this rule.

The charges against the pilots basically alleged that their conduct was prejudical to the best interest of the union, but *the defense of the pilots was retaliation.* It was entirely possible to make out some kind of a case against the pilots by written documents, but to do so through a person who had no knowledge of said documents, could not in any way answer any questions with respect to them, and could not lay a proper foundation for their introduction, was a clever strategem to deny the pilots their right to make their defense of reprisal in the only way it could be made, through cross-examination of O'Donnell and possibly the other officers.

The District Court held that "the accused parties either *expressly* or *silently* decided not to specifically request witnesses . ." Memorandum and Order, June 3, 1976 (J.A. 517, emphasis added). No cases were cited in support of this holding.

The majority opinion obliquely holds that the pilots waived their right to cross-examine witnesses, to-wit, that the courts

have also uniformly declared that union members who *knowingly fail* to exercise rights guaranteed or offered them in connection with union disciplinary proceedings have *waived* those rights. Indeed, even under the more stringent procedural due process standards applicable to criminal proceedings the courts have held that the right to confront and cross examine witnesses may be waived. *Taylor v. United States,* 414 U.S. 17, 19–20, 94 S.Ct. 194, 38 L.Ed.2d 174 (1973). (Emphasis added).

Text at page —— of 185 U.S.App.D.C., at page 735 of 566 F.2d.

Such holding might be all right where one has a lawyer present and where a judge is presiding (as was the case in *Taylor v. United States*)[4] but certainly in a proceed-

---

**4.** *Taylor* involved a criminal defendant who voluntarily chose to absent himself from his trial for selling cocaine. Taylor argued that he should have been explicitly warned that the trial would not be halted to suit his convenience. The Supreme Court found that Taylor had voluntarily waived his right to confront his accusers by his choice not to be present, and

ing of this character an *express waiver* should be required. Ritz' statement to that effect (*see* note 7, Maj. Op.) had reference to the proceedings before the Hearing Board but not to the proceedings before the Appeal Board.

During the hearing there was considerable jockeying between the Board, Mudd, and the charged parties over whether the charging parties would be presented for cross-examination.

Mudd, at one time in the hearing said: "I will *have* to bring the people [the charging parties] here to put this on." (Emphasis added.) This illustrates his concept of what fairness required; that he considered he was not competent to present the evidence; and that the presence of the charging parties was necessary to a fair presentation of the case against the charged parties.

One of the charged pilots quoted an earlier statement of one of the charging parties to the effect that in order "to have a full and fair hearing . . . the accused should be able to face his accusers . . . [y]et I do not see Mr. Giberson nor any of the other three national officers present." Mr. Mudd also requested that "the charging party . . . be present, and I would like to have a postponement until . . . we have a copy of the transcript . . ." (J.A. 220–21). The request for a postponement was refused because the Board felt the *necessity of having the charging parties present at the hearing at once:*

THE CHAIRMAN: Back on the record. Mr. Mudd, the Board has considered your request [for delay so that the charging parties could be present] and we think that the time that you request is highly excessive. We would also like to say that the accusers—the accused have gotten their material together fairly well. I would say very well. This is no reflection on you in the presentation but *it is the opinion of this Board* that the officers who brought charges against these people

that he should have known the trial would continue. By contrast, with the hearing officers and the accusing parties' representative all expressing a willingness to call witnesses, the

are dealing with it rather lightly, and that these gentlemen have put out some effort to defend themselves, and that this Board feels that the Association or the people that brought these charges, it is about time that they shuffle up a little bit. If they have to get on airplanes and get down here tonight to get this thing in order, why we think it is proper that they do that.

This Board will stand in recess until 1:00 o'clock tomorrow afternoon, and we will reconvene in room 221–231.

(J.A. 222–223) (emphasis added). Yet, when the proceeding convened the following day the charging parties were again *not* present. From the record it is obvious that the respondents at the time of that recess thought that they were eventually going to face their accusers without their having to incur disfavor with their national officers by requiring their presence. This conclusion was self-evident when Mudd made statements to that effect and the Chairman of the Board did likewise. If any of the charged parties had been represented by counsel they would have known better how to proceed. The proceeding under the union constitution does not permit parties any form of compulsory process to require the attendance of witnesses. At a minimum the union should provide that its members—at least its officers—have an obligation to testify at union disciplinary hearings when requested. This should be true particularly when the union rules, as here, *require* the presentation of evidence *by the charging parties* and a union officer is the charging party (J.A. 139). This is similar to requiring the deponent who swears to a criminal complaint to be present and testify as to the charges he filed under oath.

However, in the last analysis the charged parties did not clearly and finally demand the presence of the charging parties *before the Hearing Board.* See note 7, Maj.Op. At various times such witnesses were offered (J.A. 137, 155–56, 159–60, 169–70, 178), declined (*cf.* 444), demanded (475–477),

charged parties here could not be presumed to know that they themselves had to urge the presence of their accusers or forever forego the right of confrontation.

not demanded (J.A. 221, 223), expected by both sides and the board, but eventually they were not presented, not demanded, and were not finally called. Although the Union rule provides for the presentation of evidence by "the charging party," I do not find that the *initial hearing* before the Hearing Board lacked fairness because of the absence of such parties at the hearing before the Hearing Board. The foregoing description of the hearing does however indicate considerable irregularity in its conduct.

However, when the case reached the Appeal Board, Ritz *did* formally request that such board permit him to present additional evidence consisting of the cross-examination of O'Donnell (J.A. 477). The Rules of the Appeal Board do not limit it to the record before the Hearing Board and *authorize* such procedure of presenting additional evidence before them (J.A. 487). It is no answer to dispose of this issue, as the majority does, by saying one cannot present new evidence in an appeal *court*. The union rules give him that right on appeal. The Appeal Board, however denied such request on the argument of O'Donnell that Article VIII, Section 4C gave it "the power to hear an appeal solely upon the record already made . . ." (J.A. 487–488). Of course they had the "power," but did they have the "right" to do so in this case? The federal labor law requires that union members must receive a "full and fair hearing" from their union. This is as much a requirement of the appeal as of the initial hearing and the record does not indicate that the Appeal Board ever considered or justified its denial of Ritz' request to cross-examine O'Donnell within the framework of affording Ritz the "full and fair hearing" the statute requires. I would hold that the Appeal Board denied a fair hearing when it relied upon its power to hear a case "solely upon the record already made" without demonstrating that in so doing the charged parties had been afforded a full and fair hearing according to the union rules before *both* the Hearing Board and the Appeal Board.

Any person who views this case realistically must admit that the finesse indulged in by the charging parties of having a person, who possessed no knowledge of the charges he was presenting, appear for them at the hearing in order to avoid their cross-examination by the charged parties in support of a defense of "retaliation," did actually operate to deny Ritz and the other pilots the *fair* opportunity that the statute requires to present their evidence on that point. I would thus set aside the punishment imposed because Ritz was not afforded that opportunity *on appeal* when he properly requested it and when the union rules provided for presenting such evidence at that stage of the proceedings.

Further in connection with the hearing on appeal, section "F" of the "Rules of Procedure" of the *Appeal Board* provide as follows:

### F. ORDER OF PROCEDURE

The Appeal Board has established the following order of procedure:

1. *Presentation of evidence*, if any, and argument by the appellant, (the party who appealed).
2. Presentation of evidence, if any, and oral argument by the appellee, (the other party to the appeal).
3. *Presentation of rebuttal evidence*, if any, and rebuttal argument by the appellant, (party who appealed).
4. Presentation of rebuttal evidence, if any, and rebuttal argument by the appellee, (the other party to the appeal).
5. Questions from the Board to both parties.

The cases will be heard in common hearing session rather than each side being heard privately. *Cross examination of each other by the parties to a case is not permitted.*

(J.A. 480) (emphasis added).

These rules obviously contemplate the "presentation of evidence" before the Appeal Board and "cross-examination" of witnesses. But it denies "*Cross-examination of each other by the parties to a case . . .*" (J.A. 480, emphasis added). When the other rules do not permit a charged party to be

represented by legal counsel—and he thus must as a practical matter represent himself—*the rule effectively prevents a charged party from presenting his defense when he is representing himself and his defense requires the cross-examination of the charging party—as here.* I would thus hold that, in this aspect of the case, this prohibition of cross-examination of an adverse party by a party who is required to, and is representing himself, also constituted a denial of a "full and fair hearing." When the Appeal Board denied Ritz' request to cross-examine O'Donnell it could have been relying wholly or partially on this provision. Ritz was representing himself and under the rule could not have cross-examined O'Donnell. The majority opinion in attempting to answer this point tries to explain it away by contending that the rule means "that there is to be no cross-examination of an individual simply because he is a party," and that "if he is a witness, and gives testimony that is material, he would be subject to cross-examination." The rule, however, does not so restrict itself. It refers to all "cross-examination of each other by the parties . . ." which would obviously include "cross-examination" in its purest form when directed against a "witness" as well as when addressed against one whom a charged party calls as a "charging party," an adverse witness, and hence does *not* present him as *his witness* so as to avoid being bound by his testimony. The fact that the majority make the distinction between Ritz calling O'Donnell as an "accuser," and not as a "witness," makes it clear that under their interpretation of the rule Ritz could not cross-examine O'Donnell as a "party," *i. e.*, as accuser. This would deny Ritz the right to cross-examine O'Donnell merely because in his status as a charging party he was *adverse.* Such right, however, is generally recognized and to deny it results in a situation that is totally lacking in fairness. And, when the majority further declares that because the charged parties "expressly refused to call [the charging parties] as (hostile) *witnesses* in resisting the charges, . . . *that in our view is an end of the matter,*" (emphasis added), they arbitrarily obliterate the right that the union rules clearly give members to present evidence to the Appeal Board. Actually, the refusal of the charging parties to present any *evidence* should have been the "end of the matter"—it should have been dismissed for failure to comply with the union rule and for the failure to present any evidence through a competent witness. There is no justification for such upholding the Board's ruling.

The majority also attempt to make a point of the fact that "the individuals who signed the charges [O'Donnell, *et al.*] did not appear as witnesses in support of the charges . . ." (Maj.Op. at p. —— of 185 U.S.App.D.C., at p. 738 of 566 F.2d). That is one of the worst things about this proceeding. Their presence was duly requested by Ritz.[5] Not only were the parties

---

5.     6 Doncaster Road
            Lynnfield, Mass. 01940
            September 12, 1975
Captain David P. Jones
ALPA Appeal Board Chairman
3633 Camelot Drive
Annandale, Virginia 22003
Dear Captain Jones:
    This is to advise you that I am requesting the following witnesses be present at the Appeal Board hearing of *O'Donnell, et al., v. Ritz* that is to be conducted at 0900 on 23 September 1975 in the Washington office:

    Mr. E. Flack, ALPA Director of Acc.
    K. Shaughnessey, DAL Captain
    R. Miles, DAL Captain
    In addition, I am expecting to be able to face all of my accusers, J. J. O'Donnell, A. Bonner, Wm. Davis and J. Giberson.

If the Appeal Board construes that a member's right to face his accuser to mean that the accused must first demand that his accuser appear, then please consider this as my demand that all of my accusers, J. J. O'Donnell, A. Bonner, Wm. Davis and J. Giberson, be present at the hearing.

             Sincerely,

             /s/ Karl F. Ritz
             KARL F. RITZ

cc: W. W. Anderson

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

(J.A. 477).                    EXHIBIT F

who made the charges "not witnesses in support of the charges" they filed but also *no witness testified in support of the charges.* Mudd denied being a witness, competent or incompetent, and rested on the claim that he was presenting material that he knew nothing about. The total unfairness presented by this cumulation of procedures, each lacking fairness in some respect, is an additional ground for vacating the Board's decision.

The full and fair hearing required by the Landrum-Griffin Act includes the right to confront and cross-examine the accusers. "[I]t is clear that cross-examination is still an integral part of 'full and fair hearing' in § 101(a)(5); and the courts have so held." *Gleason v. Chain Service Restaurant,* 300 F.Supp. 1241, 1251 n. 8 (S.D.N.Y.) *aff'd,* 422 F.2d 342 (2d Cir. 1969). *See also Parks v. International Brotherhood of Electrical Workers,* 314 F.2d 886, 912 (4th Cir.), *cert. denied,* 372 U.S. 976, 83 S.Ct. 1111, 10 L.Ed.2d 142 (1963); *Local No. 2, International Brotherhood of Tel. Workers v. International Brotherhood of Tel. Workers,* 261 F.Supp. 433, 436 (D.Mass.1966) and cases cited therein; *Anderson v. Brotherhood of Carpenters,* 47 CCH Lab.Cas. ¶ 18,400 at p. 29,550 (D.Minn.1963); *Yochim v. Caputo,* 46 CCH Lab.Cas. ¶ 17,894 at p. 27,741 (S.D.N.Y.1962). *Cf. Kuebler v. Cleveland Lithographers,* 473 F.2d 359, 364 (6th Cir. 1973); *Kiepura v. Steelworkers Local 1091,* 358 F.Supp. 987, 990 (N.D.Ill.1973). *See generally* Etelson & Smith, *Union Discipline Under the Landrum-Griffin Act,* 82 Harv.L. Rev. 727, 745–46 & n. 96 (1969); Summers, *The Law of Union Discipline: What the Courts Do in Fact,* 70 Yale L.J. 175, 203–204 (1960). Where the charges are in written form, and those writings are introduced as evidence, the right to cross-examine necessarily encompasses the right to confront one's accusers.

If the union rules were different it could be argued, of course, that a union need only

provide one opportunity for a full and fair hearing. However, the events that occurred before the Hearing Board did not provide such an opportunity. The hearing was replete with confusing and misleading references to the imminent summoning of the accusing union officers on the Hearing Board's own authority. At many junctures, it appeared that the Hearing Board had decided that the union officers had to be and, would be, asked to appear. In that situation, the charged pilots might have been content not to press their right to cross-examination, in the belief that someone else would require the production of the charging parties and "take the heat" for summoning the top union officers.

It is most unrealistic to assume that the pilots, denied the assistance of legal counsel at the hearing, should have foreseen the preclusive consequences the Appeal Board would apply to their acquiescence in the series of false starts and buck-passing that characterized the Hearing Board's deliberations. Hence, the denial of the request to cross-examine the accusing officers, where there was no proof of any *informed waiver* of that right, followed by the denial of the confrontation-cross-examination right on appeal, denied petitioners a full and fair hearing.

Concerning the right to present evidence before the Appeal Board, there is an additional reason for finding the procedures afforded to be inadequate. The union's rules here provided that "[u]pon application of either party to the appeal and for good cause shown, the Appeal Board may hear additional evidence in the case . . ." (J.A. 479). The good cause shown was amply provided by the Hearing Board's own frequent statements that the presence of the officers was necessary,[6] by the charged parties' defense of retaliation, and by Ritz' letter of request. Where the rules of the union, as here, provide for the "presentation of evidence" on *appeal* to the Board, it

---

6. Consider, for example, among many similar references, the statement of the hearing officer

that the accusers "should get down here tonight to get this thing in order." (J.A. 223).

is as much a denial of a fair hearing to deny a union member the right to present evidence at that stage, as it would have been at an earlier stage had the right then been demanded. Had the union rules not provided for the presentation of evidence on appeal the appeal might have been limited to the evidence at the earlier hearing, but the rules provided otherwise and Ritz had a right to rely on them. In refusing his request they denied him the only real opportunity he had to present his defense of retaliation. To say he could have presented it at the trial hearing overlooks the fact that Ritz was not a lawyer; it is demanding too much of a charged party with no legal training to formulate a defense and present it immediately after hearing the prosecution's case. Even Mudd who presented the case, as best he could, for the charging parties confessed to an inability to answer any questions concerning what he had presented. And, an individual who may be ultimately affected by action of the Board might not attempt to take an overly active role in the proceedings, where many others are also involved, for any number of legitimate reasons.

This is also as good a place as any to take issue with the contention that Mudd was acting as a "representative" for the charging parties when he "testified" and that the union rules permitted union members to represent other union members in this manner. It is submitted that this rule means he can represent him as *counsel* and that it does not mean he can testify as a witness as though he were the other member when he admittedly knows absolutely nothing about the subject matter of his testimony. The right to represent another does not automatically infuse the knowledge of one person into the mind of another and qualify him to testify as though he were the other person. It certainly did not in this case.

### IV

Rule (D) of the Appeal Board's Rules of Procedure provides:

It is the policy of the Board that a member disqualify himself in any case involving pilots of his own airline.

(J.A. 479).

Two of the charging parties who signed the charges against the MEC members (including Ritz) were Captain Giberson (of Braniff) and Captain Davis (of United). It was these charges that were the basis of the disciplinary hearing and the subsequent fine imposed on Ritz. The charges were heard by a board of four that included Captain Jones and Sieber who were also employed by Braniff and United. Thus, two board members heard a "case involving pilots of [their] own airline." Compliance with their own union rule required that the two members of the board from Braniff and United "disqualify" themselves since the *case* they were hearing did *involve* pilots of their own airlines, *i. e.*, two of the charging parties. It is no answer to this failure to comply with this Rule to assert: "The two charging parties were no longer officers of ALPA at the time of the appeal (J.A. 486), and any involvement was *nominal.*" Maj. op. p. —— of 185 U.S.App. D.C., 737 of 566 F.2d. (Emphasis added). Even if it were just "nominal," which it is not, nominal involvement *is* still involvement and that is the standard the rule establishes for disqualification. While the charging parties may have ceased being officers they did not cease being the charging parties and it was their credibility that was involved to a certain extent. As for "any involvement being minimal," I cannot see how involvement could be any more substantial than having two "disqualified" members being assigned to decide the case. That is not minimal involvement. It was on the charges preferred by Giberson and Davis and two officers from other airlines that the hearing was conducted and punishment imposed. Their successors in office were never involved in any way in the charges against Ritz. The fact that Giberson and Davis did not choose to appeal, furthermore, did nothing to refute the fact that, as charging parties, *they were involved* in the case. Prevailing parties practically never appeal but they always continue as parties. That is all the union rules require for disqualification of the members to judge the case as members of the Appeal Board. The union policy rule on disqualifi-

cation is absolute, like the federal statute on judges who have a stock interest (however minimal) in a corporation appearing before them. 28 U.S.C. § 455 (1970). It does not establish a discretionary right. In such a case it is not necessary to try to ferret out and document actual prejudice. Where the relationship is disqualifying, and that is the union rule, to sit in judgment is prohibited. What the union rule seeks and demands is what is basic in such situations, that board members who "judge must be 'perfectly and completely independent . . .'" *United States v. Manton*, 107 F.2d 834, 846 (2d Cir. 1939), *cert. denied*, 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012 (1940). If actual prejudice were necessary it can be found in the cavalier denial by the Board of Ritz' written request to present additional testimony from O'Donnell as was authorized by the rules of the Appeal Board. Thus the two members of the Appeal Board from the same airlines were absolutely disqualified and should have recused themselves. Failing this the Appeal Board, by its own rules, was improperly constituted. This basis alone is sufficient to set aside the entire proceeding.

ALPA contends that since the employment relationship of the accused, or the accusers, was not an issue in this case the board has discretion to determine that there was no need to invoke the policy set forth in rule (d) and disqualify Jones and Sieber. However, there is nothing in the policy stated with respect to the composition of the board that requires that it be limited to circumstances where the employment relationship of the accused, or the accusers, are in issue. The rule is grounded in an obvious recognition by the union of the fact that pilots for the same airline most frequently have a close personal relationship with each other, sometimes of many years' standing. Airline pilots always work in teams of two—pilot and co-pilot—and the relationships between the pilots can become very close. In order to get around this close camaraderie of pilots and to insure a fair hearing, the rule provides that union members who are accused of union violations should not be tried by pilots from the same airline as the pilots who bring the charges. This is perfectly understandable. It is a rule designed to avoid bias and assure a fair hearing. The reason is apparent and the rule was imposed by the pilots themselves because they appreciated from their own experience, flying as pilots with other pilots of airlines, that such disqualification was necessary to insure a fair proceeding. The plain language of the rule was here violated. The proceedings were thus a nullity because this requirement that the union itself established to assure a fair hearing was not complied with. What is considered unfair by the union rules should occupy the same status under the statute which requires a "fair hearing."

## V

The Appeal Board found Captain Ritz guilty for his failure to render requested information to the ALPA home office needed to complete LM 2 reports and for *his refusal to follow proper channels as prescribed by the consent order in Ruby v. Hodgson* (J.A. 493). He was not charged with the italicized conduct. In fact such act (the independent filing of the LM–2) occurred on June 20, 1973 after the charges here were filed on May 25, 1973. This *is an obvious violation* of a fair trial—finding one guilty of an offense one is not charged with.

## Conclusion

The rights of unions to conduct their own disciplinary hearings was not encroached upon by the Taft-Hartley Act. However, by the time of Landrum-Griffin, because of union abuses, Congress considered it necessary to statutorily require a "full and fair hearing"—to be enforced by the United States Courts. Courts should be reluctant to interfere—but if the unions wish to continue to exercise the great power they possess over their own members without more interference from courts, they should be doubly cautious. They should certainly comply with their own Rules. Because the Union here did not comply with its own rules requiring the recusal of board members for a disqualifying employment; be-

cause the Appeal Board found Ritz guilty of an offense he was not charged with; because Ritz was denied the right given him by the Union rule to introduce evidence before the Appeal Board; because the Union rules deny a charged party, who must represent himself, the right to cross-examine a charging party and such rule may have been the basis for the decision of the Appeal Board to deny Ritz' request for cross-examination of O'Donnell; because O'Donnell's presence before the Appeal Board was necessary to insure Ritz a full and fair hearing; and because the Appeal Board did not consider whether it was denying Ritz the fair hearing he was entitled to when it denied him the right to cross-examine O'Donnell by its decision to decide the case solely on the record made by the Hearing Board, I would decide that Ritz was for these reasons denied the "full and fair hearing" to which he was entitled under the statute. I would therefore vacate the decision of the Appeal Board. To this end I respectfully dissent.