Robert LOEKLE and James
Brady, Plaintiffs,

v.

Edward HANSEN, Individually and as
President, of Local One Amalgamated
Lithographers of America; and Local
One Amalgamated Lithographers of
America, Defendants.

No. 82 Civ. 6425 (RLC).

United States District Court,
S.D. New York.

Nov. 4, 1982.

Robinson, Silverman, Pearce, Aronsohn & Berman, New York City, for defendants; Matthew Silverman, James F. Gill, Michael F. O'Toole, Andrew Irving, New York City, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

This case raises difficult questions regarding where the free speech rights of union members end and their duties to their union begin.

Plaintiffs Robert Loekle and James Brady, members of Local One of the Amalgamated Lithographers of America, have long been active in the local's politics and have often been at odds with its officials. *See, e.g., Loekle v. Swayduck*, 94 LRRM 2442 (S.D.N.Y.1976) (Knapp, J.). Defendant Local One represents approximately 9,000 lithographers in the New York metropolitan area and is affiliated with the International Typographical Union. Defendant Edward Hansen is the local's president.

## FACTUAL BACKGROUND

The relevant facts in this case begin in November 1980, when Brady, a candidate for trustee of Local One and trustee of the local's pension fund, protested that several incumbents had used union funds to mail campaign letters in violation of federal law. 29 U.S.C. § 481(g). Defendants' Exhibit G, pp. 8–10. On November 28, 1980, Local One officials, in response to the protests, agreed to allow all candidates to send out one mailing paid for by the union treasury. Questioning the good faith of this proposal inasmuch as balloting had already begun, Brady went to the post office on Eighth Avenue between 31st and 33rd Streets on the morning of December 1 to see how many ballots had already been mailed in. Defendants' Exhibit G., pp. 9–10.

According to Brady, postal clerks there told him that there were seven mailbags of ballots and no "stop order" on them to prevent anyone without due authorization from taking the bags. Brady said the postal clerks had also told him that someone identifying himself as a representative of

Hall, Clifton & Schwartz, New York City, for plaintiffs; Burton H. Hall, New York City, of counsel.

Local One had removed a mailbag containing ballots earlier that day. Brady Affidavit ¶¶ 6–7. Brady was disturbed by the news because the balloting was not to be completed until December 9.

Brady reported what the postal clerks had told him to officials of the Department of Labor. Brady also consulted with an attorney who talked to a postal inspector and was told that a mailbag containing ballots had been given to an unknown person. Brady Affidavit ¶¶ 8–10. In addition, Brady told plaintiff Loekle, an active Brady supporter, what he had learned about the mailbag.

Although Brady met with Local One's secretary-treasurer, Frank Casino, the afternoon of his initial visit to the post office, he did not tell Casino what he had heard about the mailbag. Indeed, at no time between his visit to the post office on December 1 and the end of balloting on December 9 did Brady share what he had learned with any union official. Defendants' Exhibit G, pp. 16–17. Brady was elected to the two offices for which he ran.

In mid-December, Brady's and Loekle's lawyer told them that a postal inspector had conducted an investigation and had concluded that no mailbag had been taken. Brady Affidavit ¶ 11. This was confirmed in a conversation that Brady had with the postal inspector around January 1, 1981. Defendants' Exhibit D, p. 19.

On January 10, 1981, Loekle sent a letter, signed by him alone, but written with Brady, to Local One's Council Board, the local's governing body. In addition to complaining about the use of union funds to mail campaign literature, the letter charged:

> On or about Monday, 1 December, a person representing himself to be from Local One appeared at the post office and requested that the ballots be delivered to him. One bag of ballots was delivered to him by the postal clerk. That the union provides no safeguard against delivery to unauthorized people, and that such delivery is alleged to have occurred, violates the secrecy of the ballot provided for in both the Bylaws and Federal law.

Plaintiffs' Exhibit B. Nowhere in the letter did Loekle state that a subsequent investigation by a postal inspector had failed to establish that a bag had been taken.

At Loekle's request, his letter was read at Local One's meeting on January 27, 1981. Neither Loekle nor Brady informed the members at the meeting, however, that a postal investigation had concluded that no bag had been taken. Brady Affidavit ¶ 15.

Local One's Council Board referred the charges raised in the letter to its Referendum Board, which is responsible for overseeing elections. On April 9, 1981, Brady met with the Referendum Board and explained to it what he had been told about the mailbag and the lack of a "stop order" on the local's postbox. After this meeting, the Referendum Board had the local's attorney contact a postal inspector who told him, first, that an investigation had failed to establish that a mailbag was taken and, second, that the plaintiffs had been apprised of the investigation's results. Casino Affidavit ¶ 16.

In the fall of 1981, the chairman and secretary of the Referendum Board brought charges against Loekle and Brady, accusing them of violating the local's bylaws by engaging in conduct "unbecoming a good union member" and conduct "detrimental to the welfare of Local One." In the first charge, they accused Brady alone of having "deliberately concealed" from responsible local officials from December 1 through December 9, 1980, "the information concerning the 'missing' mailbag containing Local One ballots." The charge also stated that "Brother Brady had a duty and obligation both as a union member and a candidate to make such information known to the Local One Referendum Board and/or other appropriate union officials immediately." The charge concluded that "the concealment of such fact for the duration of the election period constituted conduct unbecoming a good union member in violation of Section 13.1(p) of the By-Laws and conduct detrimental to the welfare of Local One in violation of Section 13.2 of the By-Laws." Plaintiffs' Exhibit D.

The second charge was brought against both Brady and Loekle. It stated that in their January 10 letter, which charged that a mailbag had been taken, and in having the letter read at the January 27 membership meeting, "Brothers Brady and Loekle deliberately withheld from the members the information they then had that upon further investigation by the Postal authorities the final determination ... was that no such thing had happened. The reading of the charge by Brothers Brady and Loekle with this omission was disruptive in that failure to reveal the Post Office Inspector's conclusion was misleading and deliberately calculated to needlessly alarm the members concerning the integrity of the Local's election procedures." This charge again stated that the disputed conduct was "unbecoming a good union member" and "detrimental to the welfare" of the local. Plaintiffs' Exhibit D.

On December 14, 1981, Loekle and Brady were sent copies of the charges against them and were advised that they would "be afforded a full and fair hearing" and could be "accompanied and assisted at the trial by a member of Local One in good standing." Defendants' Exhibit F.

At the trial, which was held by the Council Board on May 5, 1982, Loekle and Brady represented each other. The two were the only formal witnesses, and the trial consisted for the most part of their being asked several dozen questions each.

Loekle and Brady requested that the charging parties, i.e., the president and secretary of the Referendum Board, and three former Local One trustees who had held office in 1980 be present at the trial so that Loekle and Brady could examine them. The president and secretary of the Referendum Board appeared, but Brady and Loekle were allowed to ask them only a few circumscribed questions because, as defendant Hansen said while chairing the trial, "They are not here as witnesses for you fellows ...." Defendants' Exhibit G, p. 67. The former trustees whom plaintiffs wished to question did not appear at the trial because

their examination, according to union officials, was not relevant to the charges being tried in that Brady and Loekle wanted to ask them about campaign violations occurring in the 1980 election. Defendants' Exhibit G, p. 78.

Loekle and Brady were found guilty on all counts. Loekle was fined $100 and Brady $200. Defendants' Exhibit G, p. 91. Under the local's bylaws, Brady had to relinquish the two offices to which he had been elected. Brady Affidavit ¶ 36. In addition, the convictions exclude Loekle and Brady from running for union office for a period of two years. Brady Affidavit ¶ 34.

In their complaint, plaintiffs charge that their convictions violate §§ 101(a)(2), 101(a)(5), 102, and 609 of the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. 411(a)(2), 411(a)(5), 412, and 529.[1] They seek compensatory and punitive damages, a declaratory judgment that the punishment is null and void, and equitable relief enjoining defendants from barring them from running for office.

Loekle and Brady have moved for a preliminary injunction, pursuant to Rule 65, F.R.Civ.P., enjoining defendants from barring them from running for office in the upcoming election for which nominations were scheduled for October 26, 1982. Loekle Affidavit ¶ 3.

LEGAL DISCUSSION

In this Circuit, the standard for granting injunctive relief is "a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979). It is clear that Brady and Loekle will suffer irreparable injury if they are not allowed to run for office in Local One. For the reasons stated below, the court finds that Brady and Loekle have shown a likelihood of success on the merits.

1. The court has jurisdiction of this matter un-    der 29 U.S.C. §§ 412 and 529.

## I. Charge One

Brady was charged with and punished for having failed to notify local officials about the supposedly missing mailbag between the time he initially went to the post office and the conclusion of balloting eight days later. Brady argues that his conviction violates § 101(a)(2),[2] while defendants contend that Brady's failure to report what he knew about the mailbag falls outside the protections of that provision.

In *United Steelworkers of America v. Sadlowski,* —— U.S. ——, 102 S.Ct. 2339, 72 L.Ed.2d 707 (1982), the Supreme Court articulated the proper approach to analyzing whether a union rule or action is valid under § 101(a)(2):

> [W]e first consider whether the rule interferes with an interest protected by the first section of § 101(a)(2). If it does, we then determine whether the rule is "reasonable" and thus sheltered by the proviso to § 101(a)(2).

*Id.* 102 S.Ct. at 2345. With regard to the first part of this analysis, plaintiffs assert that § 101(a)(2) gives union members not only a right to speak, but also a right not to speak, while defendants argue that § 101(a)(2) furnishes no right to remain silent.

■ Although Congress did not intend the scope of § 101(a)(2) to be identical to that of the first amendment, "Congress [nonetheless] . . . intended § 101(a)(2) to restate a principal First Amendment value—the right to speak one's mind without fear of reprisal." *Id.* at ——, 102 S.Ct. at 2345. Because § 101(a)(2) protects first amendment values and because the right not to speak, like the right to speak, implicates such values, defendants' contention that Brady's failure to speak falls outside

the scope of § 101(a)(2) must be rejected. So long as there is no express obligation to speak, a person's right to remain silent must be protected. Indeed, the Second Circuit has held, albeit in circumstances different from this case, that the first amendment protects both a right to speak and a right not to speak. *Russo v. Central School District No. 1,* 469 F.2d 623, 634 (2d Cir. 1972), *cert. denied,* 411 U.S. 932, 93 S.Ct. 1899, 36 L.Ed.2d 391 (1973); *see also Lipp v. Morris,* 579 F.2d 834, 836 (3d Cir.1978). We thus hold that § 101(a)(2) gives union members, in the absence of an explicit duty to speak, a right to remain silent as well as a right to speak without fear of punitive retaliation from union officialdom.

■ Moving to the second part of the § 101(a)(2) analysis, defendants assert that their disciplining of Brady was a reasonable action to further the interests of the union as an institution and was thus justifiable under the proviso to § 101(a)(2). Defendants argue that it was proper for the union to punish Brady on Charge One because the union has a Referendum Board to which complaints about election misconduct should be directed and because only if Brady had reported the "missing" mailbag could the union have acted on this information before the election ended.

Defendants' assertion that the disciplining of Brady was reasonable must be rejected for several reasons. First, defendants fail to point out any provision in Local One's bylaws requiring members to report election violations. Courts have long recognized the dangers of allowing individuals to be punished for failing to act in the absence of explicit rules mandating the action not taken, *see, e.g. United States v. Van Schaick,* 134 F.592, 608 (C.C.S.D.N.Y.1904);

**2.** Section § 101(a)(2)

Freedom of speech and assembly.—Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organiza-

tion's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

Model Penal Code Proposed Official Draft § 2.01(3) (1962).[3] Before Brady was disciplined, Local One had imposed no explicit duty on him or others to report election violations, and upholding punishment in such a case would consequently give union officials too much leeway to punish members arbitrarily and to discipline members who oppose or criticize them.[4]

Second, during his trial, Brady stated that one of the reasons he did not step forward immediately to tell local officials the information he had about a "missing" mailbag was his fear of retaliation and harassment. Defendants' Exhibit G, pp. 19–20. Indeed, when Brady met with the Referendum Board on April 9, 1981, to explain what he knew about the mailbag and why he did not report the incident before the balloting ended, Brady described previous retaliatory measures taken against him. Defendants' Exhibit D, p. 25. *Cf. Loekle v. Swayduck,* 94 LRRM 2442 (S.D.N.Y.1976).

Third, Brady explained at his disciplinary hearing that he felt there was little reason for him to complain at once to union officials about the supposedly missing mailbag because he was sure his complaint would be ignored or prove futile. Defendants' Exhibit G, pp. 18–19.[5] Upholding a union member's punishment for not reporting a violation because he believed his complaint would be ignored would give the very officials who make bringing the complaint futile the power to punish the frustrated union member who opted not to file the complaint.

Fourth, and ironically, because they hold the union's reins of power, incumbents who often engage in campaign violations will be the least likely people to be punished for failing to report violations, while those most likely to be punished for failing to report will be members who challenge incumbents and know of their campaign violations. Thus, upholding the conviction of a challenger in such a situation could undermine union democracy.

For all these reasons, the court concludes that it would be unreasonable to uphold Local One's punishment of Brady for failing to report an incident when the union had placed no explicit duty on him to report it and when he believed that reporting the incident would prove futile and trigger reprisals against him.

## II. *Charge Two*

Under Charge Two, plaintiffs Brady and Loekle were charged with and disciplined for "deliberately misleading" the union by writing a letter which requested an investigation into the purportedly missing mailbag and by having that letter read at a membership meeting—all without mentioning that they had been told that a postal investigation had concluded that no mailbag had been taken. Plaintiffs assert that the defendants violated § 101(a)(2) by disciplining them for the letter because, they argue, its contents constituted protected speech. Defendants contend that Brady and Loekle could be punished under the proviso to § 101(a)(2) because their letter contained knowingly misleading statements that contravened their responsibility toward the union as an institution.

3. While unions are allowed to discipline members for *actions* not specifically prohibited by union rules, *International Brotherhood of Boilermakers v. Hardeman,* 401 U.S. 233, 243–44, 91 S.Ct. 609, 615–616, 28 L.Ed.2d 609 (1971), allowing unions to discipline members for failing to act when no express duty to act has been placed on them would create great potential for abuse.

4. The case that defendants cite in which the punishment of a union member for failing to report was upheld is clearly distinguishable. In *Ritz v. O'Donnell,* 413 F.Supp. 1365 (D.D.C. 1976), *aff'd,* 566 F.2d 731 (D.C.Cir.1977), a union member was disciplined for disobeying or failing to follow an express order by the union board to file a report detailing his knowledge about the collection of certain funds. There, the duty was explicit, here it was not.

5. Indeed, the LMRDA creates little urgency for union members to report campaign violations before the balloting ends because, except in extraordinary circumstances, the Department of Labor does not act to correct such violations until after the election is over. 29 U.S.C. § 482.

The first step of a § 101(a)(2) analysis can be passed over quickly here because defendants do not argue that the knowingly misleading statements contained in the letter fall outside the purview of "views, arguments, or opinions" protected by that section. This apparent concession on the part of defendants makes it unnecessary for the court to consider whether knowingly misleading statements that are not attacks upon union officials fall within or without the scope of the first section of § 101(a)(2). *Cf. Salzhandler v. Caputo,* 316 F.2d 445 (2d Cir.), *cert. denied,* 375 U.S. 946, 84 S.Ct. 344, 11 L.Ed.2d 275 (1963) (libelous attack against union official protected by § 101(a)(2), even if false) *with Gertz v. Welch,* 418 U.S. 323, 340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974) ("there is no constitutional value in false statements of fact"). Defendants instead focus on the reasonableness of a union's punishing a member who knowingly makes a misleading statement that, according to defendants, is disruptive and conflicts with the member's responsibility to the union as an institution.

Title I of the LMRDA "was designed to protect the rights of union members to discuss freely and criticize the management of their unions and the conduct of their officers." *Salzhandler, supra,* 316 F.2d at 448–49. That Title has been "broadly construed," *International Association of Machinists v. Loudermilk,* 444 F.2d 719, 723 (5th Cir.1971), "to foster truly democratic governance of labor unions." *Semancik v. United Mine Workers, District 5,* 466 F.2d 144, 153 (3d Cir.1972). In a landmark union free speech case which held that a union could not punish a member for libeling union officials, the Second Circuit interpreted § 101(a)(2) broadly and wrote that "[s]o far as union discipline is concerned [a union member] ha[s] a right to speak his mind and spread his opinions regarding the union's officers, regardless of whether his statements were true or false," *Salzhandler, supra,* 316 F.2d at 451.

■ Although cases like *Salzhandler* and *Cole v. Hall,* 339 F.2d 881 (2d Cir.1965) (union cannot punish member for "malicious vilification" of official), make clear that § 101(a)(2) affords union members broad protection for their speech, that protection "is not absolute." *Fulton Lodge No. 2 v. Nix,* 415 F.2d 212, 219 n. 17 (5th Cir. 1969).[6] "Unions c[an] provide reasonable rules [under § 101(a)(2)] ... for insuring individual responsibility to the union as an institution ...." *Semancik, supra,* 466 F.2d at 153. Thus, despite the broad interpretation of § 101(a)(2), when a court confronts a case in which a union member has been disciplined for making a statement allegedly violating his responsibility to the union as an institution, a balancing must be carried out—the union member's interest in free and untrammeled speech must be weighed against the interests of the union as an institution. One of the leading commentators on the LMRDA has explained that "[d]efining the limits of th[e free speech] right [protected by § 101(a)(2)] is difficult for the words of the qualifying provisions give little guidance in difficult cases.... The line [between what is protected and what is not] is inevitably indistinct, to be picked out by the courts case by case ...." Summers, *American Legislation for Union Democracy,* 25 Mod.L.Rev. 273, 286–87 (1962).[7]

---

**6.** During the debates on the LMRDA, Senator Javits, one of its sponsors, stressed that § 101(a)(2) *does not give union members* absolute license. He asserted that

free speech is not license. Supreme Court Justice Holmes laid down the proposition long ago that it might be free speech to get up in a movie theater and to yell 'Fire', but that we could prevent it by law.... Would our colleagues have us allow a union member to get up at a union meeting and yell 'Fire'? Would our colleagues say that is free speech? ... That is nonsense and we know it.

106 Cong.Rec. 6029 (April 25, 1959), *reprinted in Legislative History of the LMRDA* at 1238.

**7.** In explaining who was to do the balancing to determine whether a union's disciplining a member for his speech was reasonable, Senator Javits stated:

Who determines what is reasonable? That is determined by the same body which always determines such questions in American public life—the courts.... The courts determine whether somebody acted reasonably in the commission of a crime. The court deter-

■ Before the competing interests are balanced in this case, it is important to note that "there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues." *Gertz v. Welch, supra,* 418 U.S. at 340, 94 S.Ct. at 3007, *citing New York Times v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964). Thus, even if Brady and Loekle had the laudable intention of prodding union officials to secure the local's postbox better during elections by placing a stop order on it, their interest in making such knowingly misleading statements, Defendants' Exhibit G, p. 55, is limited indeed and not entitled to full free speech protection. Moreover, the dissemination of knowingly false or misleading statements has minimal first amendment implications because such statements "belong to the category of utterances which 'are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order . . . .'" *Gertz, supra,* 418 U.S. at 340, 94 S.Ct. at 3007, *quoting Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942).

■ While Brady's and Loekle's constitutional interest in making such knowingly misleading statements is minimal, the union's interest in not being subjected to such potentially explosive misleading statements is substantial. A charge that improperly calls into question the right of all union officials to hold their offices is both serious and potentially disruptive. That union members would make such a charge about a subject as important as the validity of the balloting when they knew that charge to be misleading certainly violated their responsibility to their union as an institution.

Unlike *Salzhandler* and *Cole v. Hall,* this case did not require union officials to draw any fine lines between what is libelous and what is not, or what is malicious and what is not. Here the union board that convicted Brady and Loekle was dealing with a knowingly misleading statement that did not require it to sift through "delicate problems of truth or falsehood." *Salzhandler, supra,* 316 F.2d at 450.

Unlike the plaintiff in *Farowitz v. Associated Musicians,* 330 F.2d 999, 1002 (2d Cir. 1964), Brady and Loekle had no "good reason" to make such serious allegations without furnishing the union and their co-members at the very least with a cautionary note that a subsequent investigation had failed to find that a bag of ballots was missing. Whereas Farowitz "reasonably believe[d]" that his telling union members that they did not have to pay their dues was a correct interpretation of a judicial order, it was clearly unreasonable for Brady and Loekle to charge that a mailbag was missing without revealing that the postal inspector had subsequently told them that he had been mistaken and that no bags were missing.

*Salzhandler, Cole v. Hall,* and *Giordani v. Upholsterers International Union,* 403 F.2d 85 (2d Cir.1968), are not to the contrary. In each of these cases, the Second Circuit held that a union's disciplining of a member who had made provocatively critical statements about the conduct of union officials was not justified by the proviso to § 101(a)(2) because the condemnatory statements were not directed at the union as an institution. The Second Circuit recognized that intra-union politics triggers sharp charges and countercharges and that "union members [should therefore be able] to discuss freely and criticize the management of their unions" without having to worry about reprisals should their speech be a little too caustic. *Salzhandler, supra,* 316 F.2d at 448–49. Here, Brady's and Loekle's charge about the supposedly missing mailbag was not directed so much at the local's officials as at the validity of the local's election, a subject

mines what is reasonable every day. The court will do so in this instance. We have lodged the power where it belongs.

106 Cong.Rec. 6029 (April 25, 1959), *reprinted in Legislative History of the LMRDA* at 1238.

that goes to the heart of the union's function as an institution. *Sadlowski, supra,* —— U.S. at ——, 102 S.Ct. at 2346.

■ What is more, those cases protected opinions, however misguided or caustically stated. In those cases, the speakers believed that what they were saying was true. Here, Brady and Loekle could not have believed that their statement about a "missing" mailbag was a candid, accurate or true statement when they had been advised that the charge contained in the letter was false. While the first amendment protects every idea because there is no such thing as a false idea or opinion, it does not protect knowingly false or misleading statements of fact. *Gertz, supra,* 418 U.S. at 340, 94 S.Ct. at 3007. Accordingly, we hold that Charge Two was a proper charge.

III. *Fairness of Brady's and Loekle's Trial*

■ Under § 101(a)(5) of the LMRDA, 29 U.S.C. § 411(a)(5), a union is not allowed to discipline a member unless the member "has been afforded a full and fair hearing." This means that "traditional concepts of due process should apply." *Kuebler v. Cleveland Lithographers,* 473 F.2d 359, 364 (6th Cir.1973); *Reilly v. Sheet Metal Workers International Association,* 488 F.Supp. 1121, 1125 (S.D.N.Y.1980) (Broderick, J.). "The elements of such a 'fair hearing' ... generally encompass full notice and a reasonable opportunity to be heard—including the right to present evidence and the right to confront and cross-examine witnesses." *Parks v. International Brotherhood of Electrical Workers,* 314 F.2d 886, 912 (4th Cir.), *cert. denied,* 372 U.S. 976, 83 S.Ct. 1111, 10 L.Ed.2d 142 (1963); *Yochim v. Caputo,* 51 LRRM 2516, 2517 (S.D.N.Y.1962) (Murphy, J.). Another essential part of a fair hearing is of course "impartiality, i.e., open-mindedness, of the trial body." *Falcone v. Dantinne,* 420 F.2d 1157, 1166 (3d Cir.1969); *Parks, supra,* 314 F.2d at 912.

■ A fair reading of the transcript of Brady's and Loekle's disciplinary hearing reveals several flaws that render the hear-

ing so unfair that it does not satisfy the requirements of § 101(a)(5). It was unreasonable for Hansen, who chaired the trial, to refuse to allow Brady and Loekle to call and examine witnesses. When Brady asked "We are going to have an opportunity to question also, aren't we?" it was improper for Hansen to answer, "You are here to answer questions tonight." Defendants' Exhibit G, p. 49. And when Brady asked whether Loekle and he were going to have a chance to question the Referendum Board chairman and secretary, i.e., the charging parties, Hansen answered, "I am not telling you anything." *Id.* Similarly, it was wrong for Hansen to respond to Brady's request that the two Referendum Board officials be called as witnesses: "They are not here as witnesses for you fellows and whether they want to answer any questions is strictly their own prerogative." *Id.* at 67.

The court cannot accept the defendants' bald assertions that the questions Brady and Loekle planned to ask Referendum Board Chairman Anderson were not relevant to the charges brought against them. Brady and Loekle might have elicited information with regard to whether Brady was justified in failing to report the supposedly missing mailbag immediately because he feared retaliation and harassment or because he believed notifying the Referendum Board would prove a futile exercise. In addition, Brady's and Loekle's questioning of Anderson, who conducted an investigation into the mailbag incident, might have elicited some information to bolster their defense. Thus, it was improper for Hansen to assert that the investigation was irrelevant to the charges brought. *Id.* at 68–69. What is more, if Brady and Loekle had been permitted to examine the Referendum Board officials, they might have elicited some information as to whether the charges were brought against them for improper reasons; e.g., because they were union dissidents, or had filed a complaint with the Department of Labor. For these reasons, the Council Board's failure to allow Loekle and Brady to question Anderson and others

as witnesses made the hearing fatally defective.[8]

Another defect in the hearing was the lack of openmindedness of some board members. The conduct of the trial in general and the statements of several board members bespoke the "specific prejudice or a high probability of actual bias on the part of at least some members of the tribunal [which] is necessary to attack the impartiality of a tribunal." *Loekle v. Swayduck, supra,* 94 LRRM at 2445, *citing Falcone v. Dantinne, supra,* 420 F.2d at 1161.

Defendant Hansen, who chaired the trial, displayed a hostility toward Brady and Loekle that was shared by several other Council Board members. What is more, at least one member of the 15-member board appeared to have prejudged the case. After Brady, evidently wishing to make a statement in his defense, but at that point not having been allowed to do so, asked Hansen to make sure that a verdict was not in before the board returned from a recess, one board member said, "You are beating a dead horse." Defendants' Exhibit G, p. 63. In addition, it appears from other questions and comments that other board members were biased. One question revealed displeasure that Brady and Loekle had filed a complaint with the Labor Department about election violations—an inquiry not relevant to the charges brought. *Id.* at 59.[9] Another three board members, including Hansen, who chaired the trial, displayed anger at Brady and Loekle for lacking confidence and faith in certain union officials. *Id.* at 61, 63, 77. All too often the hearing seemed like an inquisition, rather than a full and fair hearing between union "brothers." The court concludes that the hearing was fatally unfair because it was infected with prejudice.

CONCLUSION

Assessing the merits of the case, the court finds that Brady has demonstrated a likelihood of success at trial in overturning his conviction on Charge One, and both Brady and Loekle have shown a likelihood in upsetting the discipline imposed on them because of the Council Board's apparent prejudice and its failure to allow them to call and examine witnesses at their trial, thus rendering it fundamentally unfair.

Accordingly, a preliminary injunction is granted ordering Local One and Hansen to allow Brady and Loekle to have their names placed in nomination.

IT IS SO ORDERED.

---

**8.** The court cannot judge, from the record, whether Loekle and Brady should also be allowed to call the former Local One trustees as witnesses. Loekle said that he had sent a letter to Local One explaining why calling them would be relevant to the charges brought against Brady and him. Defendants' Exhibit G, pp. 77–78. Not knowing whether the questions plaintiffs planned to ask the former trustees would have been relevant to Brady's and Loekle's case, the court is not ready to require Local One to produce them as witnesses.

**9.** A union is, of course, prohibited from punishing a member for filing a complaint with the Department of Labor. 29 U.S.C. § 101(a)(4). *See also Sheridan v. United Brotherhood of Carpenters,* 306 F.2d 152, 154–55 (3d Cir.1962).

Evidently, the complaint that Loekle filed with the Labor Department, charging, *inter alia,* the incumbents' use of union funds to send out campaign literature, was rejected because it was filed too late. Defendants' Exhibit G, pp. 33, 57–58. *See* 29 U.S.C. § 482(a).