William KIRRANE, Plaintiff,

v.

TRANSPORT WORKERS UNION OF AMERICA, George Leitz, individually and as International President of Transport Workers Union of America, Local 101 of the Transport Workers Union of America, and Marsha Spinowitz, individually and as president of Local 101, Defendants.

No. 90 Civ. 6077 (WK).

United States District Court,
S.D. New York.

Jan. 21, 1992.

Victor Rabinowitz, Rabinowitz, Boudin, Standard, Krinsky & Lieverman, P.C., New York City, for plaintiff.

Malcom A. Goldstein, O'Donnell & Schwartz, New York City, for defendant TWU.

Arthur Z. Schwartz, Lewis, Greenwald, Kennedy, Lewis, Clifton & Schwartz, P.C., New York City, for defendant Local 101.

## OPINION AND ORDER

WHITMAN KNAPP, Senior District Judge.

Before us are cross motions by plaintiff for partial summary judgment, and by defendants Transport Workers Union of America ("TWU") and George Leitz individually and as the TWU's International president and defendants Local 101 of the Transport Workers Union of America ("Local 101") and Marsha Spinowitz individually and as Local 101's president for summary judgment dismissing plaintiff's second amended complaint. Plaintiff, a former appointed staff representative to the TWU and an elected TWU International vice-president, has alleged two claims against the TWU and one against Local 101, seeking three distinct types of relief. With respect to the TWU he seeks: (1) restoration to his position as TWU staff member with back pay; and (2) restoration to his position as International vice-president. With respect to Local 101, for the purpose of running for president in what plaintiff hopes to be an upcoming election, he seeks a declaration that he is a member in good

standing in the Local. The various claims are based on allegations that TWU and Local 101 violated Title I of the Labor–Management Reporting and Disclosure Act ("Act") §§ 3(o), 101(a)(1), (2), and (5), 29 U.S.C. §§ 402(o), 411(a)(1), (2), and (5) and § 301 of the Labor–Management Relations Act, 29 U.S.C. § 185.

A hearing was held on the motions on January 7, 1992. We agree with both plaintiff and defendants that there are no disputed issues of fact. For the reasons that follow we grant defendant TWU's motion for summary judgment dismissing both claims against it. We also dismiss the claim against defendant Local 101 for the basic reason that the issues here presented can more appropriately be adjudicated in a presently pending action brought against Local 101 by the Secretary of Labor in the Eastern District of New York, in which action plaintiff has intervened.

\* \* \* \* \* \*

As an initial matter we note that, there being no allegations whatsoever against Ms. Spinowitz individually, we have ordered, without opposition from plaintiff, her struck as a defendant in her individual capacity.

### 1. *Plaintiff's Dismissal as TWU Staff Member*

#### A. *Facts*

Plaintiff William Kirrane began his life in the union movement in 1961 as a meter reader for Brooklyn Union Gas Co. An active member in Local 101, he held various offices and in 1969 was elected president. In 1970 he was elected an International vice-president, an unpaid position he was able to fill while remaining president of Local 101.[1] In 1979 plaintiff was appointed to a full-time paid staff position with TWU. Pl.Aff. ¶¶ 3–5.

The turbulence that ultimately lead to plaintiff's dismissal as a staff member of the TWU began in October 1989 at the TWU International Convention in Miami. According to plaintiff's version of the

**1.** Thereafter, plaintiff was reelected Local 101 president in 1972, 1975, and 1978; he was re- elected International Vice–President in 1973, 1977, 1981, 1985 and 1989. Pl.Aff. at ¶ 4.

facts, he was there engaged in the normal process of politicking that preceded the selection of a slate of candidates for union office. The Airlines Transport Division ("ATD"), which constituted roughly a third of the TWU, traditionally caucused to determine who would represent it on the slate, a practice the incumbent ATD vice-presidents, rumor had it, sought to eliminate. Plaintiff presumed that the incumbents' purpose in eliminating the caucus was to short circuit existing procedures because they feared not being reelected, and concluded that to allow such a course would cause the union "irreparable harm." He therefore vigorously lobbied against the proposed elimination of the caucus. Plaintiff asserts that defendant Leitz, the International president, informed him that his activities in this regard constituted association with dissidents, and later added a charge of disloyalty to this "bad news." As a result, plaintiff was subsequently removed from the TWU staff. Pl.Aff. at ¶¶ 14–17, 19–21.

Leitz concurs with plaintiff's conclusion that he was dismissed as a staff member because of disloyalty, but does not agree that plaintiff's activities with respect to the caucus had anything to do with the dismissal. On the contrary, he perceives the disloyalty to have arisen out of plaintiff's conduct in accepting a position on Leitz's slate as vice-president while secretly stumping for support for himself as a candidate for president or secretary-treasurer. TWU 3(g) at ¶ 3. While plaintiff acknowledges he was interested in suceeding the then secretary-treasurer, who was approaching retirement, he denies he ever having solicited support for a bid against Leitz. Pl.Aff. at ¶ 22.

On December 20, 1989, Leitz fired plaintiff, confirming this action by letter of December 21. Pl.Aff. at ¶¶ 21; Pl.Exh. 2. Plaintiff appealed this dismissal to the International Appeals Committee, which ruled that appointment and dismissal of staff positions was at the International president's discretion. The dismissal was then approved by the International Executive Council. TWU 3(g) at ¶ 9. Plaintiff has appealed to the International Convention, which next meets in 1993.

### B. Discussion

■ Following *Finnegan v. Leu* (1982) 456 U.S. 431, 102 S.Ct. 1867, 72 L.Ed.2d 239, we grant TWU's motion to dismiss plaintiff's claim seeking reinstatement to his position as a staff member. In *Finnegan*, the Court rejected claims under § 101 of the Act by appointed union officers who were fired by a newly elected local president on the grounds that Title I does not bar dismissal of policymaking officers—who continue to remain members of the union—from their jobs as officers. Such a dismissal is "only an *indirect* interference with their membership rights." *Id.* at 440, 102 S.Ct. at 1873 (emphasis in original). The Court noted that:

> [w]e need not decide whether the retaliatory discharge of a union member from union office ... might ever give rise to a cause of action under § [101].... For whatever limits Title I places on a union's authority ... it does not restrict the freedom of an elected union leader to choose a staff whose views are compatible with his own.

*Id.* at 440–441, 102 S.Ct. at 1873.

*See also Franza v. Int'l Brotherhood of Teamsters, Local 671* (2d Cir.1989) 869 F.2d 41, 47 (non-policymaking union employee can be fired by union because "*Finnegan* teaches that it is not a member's *employment by the union* that is protected by Title I; rather it is his *membership in the union* that is safeguarded") (emphasis in original)[2]; *Cotter v. Owens* (2d Cir. 1985) 753 F.2d 223, 228 ("*Finnegan* severely circumscribed the bounds of judicial intervention in intra-union factional disputes by limiting Title I claims to cases directly affecting membership rights").

Plaintiff's case presents almost precisely the *Finnegan* scenario—he was a staff officer appointed by Leitz's predecessor as

---

**2.** The *Franza* court also explains that Title I "aims to substitute a more democratic union for the autocratic union boss"; thus *Finnegan* is "a judicial attempt to advance democratic values in the conduct of union affairs without unduly interfering with union governance." *Id.* 869 F.2d at 47.

union president (though he worked under Leitz for years as well) who was fired by Leitz for perceived disloyalty—and we see no reason not to follow *Finnegan* in deferring to the union president. However, *Finnegan* allows for certain situations when Title I does and should apply to the dismissal of a staff member. *Schonfeld v. Penza* (2d Cir.1973) 477 F.2d 899, 903, identifies one such exception where the dismissal of the staff member is part of a larger, insidious scheme of intimidation in order to quash dissent in the union. *See also Cotter* 753 F.2d at 229 (though union member dismissed from safety committee had no § 101 action for dismissal, allegation "that his removal was part of an over-all scheme to suppress dissent" did state a claim).

Plaintiff has no more than *alleged* the existence of such a plot, which appears limited to a scheme to dispose of himself alone.[3] He has submitted no evidence even to suggest the existence of a grand scheme to suppress opposition to Leitz or the union leadership.[4] This exception is therefore unavailing.

*Sheet Metal Workers Int'l Assoc. v. Lynn* (1989) 488 U.S. 347, 109 S.Ct. 639, 102 L.Ed.2d 700, carved out another exception to *Finnegan*'s general rule in a case where a union-appointed trustee fired plaintiff from his *elected* staff position for plaintiff's refusal to vote in accordance with the trustee's desire to raise union dues. Assessing the fired official's claim in light of the Act's "basic objective: 'to ensure that unions [are] democratically governed, and responsive to the will of the union membership,' " *id.* at 354, 109 S.Ct. at 644 (*quoting Finnegan* at 441, 102 S.Ct. at 1873), the Court wrote that:

> The consequences of the removal of an elected official are much different. To begin with, when an elected official like Lynn is removed from his post, the union members are denied the representative of their choice … Furthermore, the portential chilling effect on Title I free speech rights is more pronounced when elected officials are discharged. Not only is the fired official likely to be chilled in the exercise of his own free speech rights, but so are the members who voted for him.

*Id.* 488 U.S. at 355, 109 S.Ct. at 645.

The critical difference in *Lynn* is his status as an *elected* staff member at the time of his dismissal—which was indisputably to silence his opposition to the union trustee's plans—not, as plaintiff argues, the timing of the dismissal. Such circumstances do not here exist; plaintiff was appointed, not elected. There being no basis for plaintiff's suggestion that *Lynn* only applies when a union officer is newly elected and seeks to dismiss the former officer's staff, we decline to adopt it. The issue of a staff member's loyalty is certainly continuous, and officers must be able to count on their staff in running the union whether they are newly elected or long-time incumbents.

### 2. *Plaintiff's Termination as TWU International Vice–President*

#### A. *Facts*

In April of 1990, plaintiff, then unemployed, mailed several hundred informational leaflets to various trade unions and union locals—both within and without the TWU—informing them that he had formed a new consulting firm, Modern Labor Methods, through which he offered assistance in areas including contract negotiations, grievance, arbitrations, training and edu-

---

**3.** In a motion for summary judgment, "[c]onclusory allegations will not suffice to create a genuine issue. There must be more than a 'scintilla of evidence,' and more than 'some metaphysical doubt as to the material facts.' " *Delaware & H. Ry. v. Consolidated Rail Corp.* (2d Cir.1990) 902 F.2d 174, 178 (*quoting Indus. Co. v. Zenith Radio Corp.* (1986) 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538. *See also Western World Insurance Co. v. Stack Oil, Inc.* (2d Cir.1990) 922 F.2d 118, 121 ("The nonmovant cannot 'escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts,' or defeat the motion through 'mere speculation or conjecture.' ") (citations omitted).

**4.** Plaintiff has adduced no evidence, for example, that would cause us to change our earlier finding that "there is nothing before us even remotely to suggest that the International was involved in initiating any challenge to his right to be a candidate in the upcoming election." November 5, 1990 Memorandum and Order, at 7.

cation programs, pension and health funds, and conducting local elections. Response to the mailing was limited, and plaintiff obtained no consulting jobs. Pl. 3(g) ¶¶ 4–5; Pl.Exh. 4. Nonetheless, Leitz and other officers of the TWU considered that plaintiff's business endeavor conflicted with his duties as a TWU officer and sought his resignation. Leitz informed plaintiff by letter of July 2, 1990 that the matter had been discussed by the Internation Executive Council and:

> in my judgment—which is shared by other officers of our Union—your promotion of Modern Labor Methods would involve you in the business of other unions in clear conflict with your obligations and responsibilities as a Vice President of the Transport Workers Union of America....
>
> Consequently, I must request your prompt resignation from the position of Vice President of the TWU.

Pl.Exh. 6.

Plaintiff did not resign, and the TWU advised him by letter of August 17 that he was suspended as a vice president and charged with behavior antithetical to the interests of the Union. The charges included the following:

> As the President of a consulting firm, Modern Labor Methods, which serves or proports [sic] to serve, and which offers professional assistance to labor unions other than the Transport Workers Union of America, you are engaging in conduct which is detrimental to the best interests of the Transport Workers Union of America, and which is unbecoming to a Vice President of our International Un-

ion and a member of its International Executive Council.[5]

Pl.Exh. 8.

A three-person subcommittee of the International Executive Council selected by the International Administrative Committee was constituted pursuant to Article V, §§ 5 and 6 of the TWU constitution[6] at Leitz's request. A hearing scheduled to take place on September 5, 1991 (within 20 days of the letter) was adjourned to September 12 at plaintiff's request. Leitz Aff. Exh. 1 at 11; Pl.Exh. 8, 10 (hearing transcript) at 7–8. Plaintiff alleges that the hearing was procedurally and substantively a "sham." Pl.Aff. at ¶¶ 32–34; Pl. 3(g) at ¶ 20. Over his repeated objections, plaintiff was not allowed counsel, nor an adjournment, nor to tape record the hearing, though he was told he would receive a free transcript of it. No witnesses testified either for or against plaintiff. The evidence consisted of the leaflet, correspondence between plaintiff and TWU officers, and correspondence among TWU officers. Pl. 3(g) at ¶¶ 8–12; Pl.Aff. at ¶ 34; Pl.Exh. 10 at 7, 18, 21, 27, 37, 41, 107–110. In advance of the hearing, plaintiff was given copies of the documentary evidence that would be used against him. Pl.Exh. 10 at 37–39.

Though plaintiff requested that he be allowed to call some witnesses, he acknowledged "I don't know what witnesses I am going to call." He did later request to call the TWU secretary-treasurer, apparently to elicit the information that in 30 years, no TWU officer had been suspended, or to "ask him about what my fiduciary responsibilities were or are." In response to this request, the hearing subcommittee inquired what questions plaintiff planned to put to the secretary-treasurer in order to deter-

---

**5.** The charge also included an accusation of unauthorized use of TWU mailing lists that was later not pursued.

**6.** Section 5 reads in relevant part:
In the event the International President shall have reason to believe that any officer or member ... conducts himself/herself in a manner which is detrimental to the best interest of the Union, or otherwise engages in conduct unbecoming a member of the Union, he/she may institute proceedings against him/her with due notice of hearing, specifying ... the nature of the conduct ... The

decision of the International Executive Council shall be subject to review by the International Convention.
Section 6 permits the president:
to suspend any officer pending the decision of the Internation Executive Council, provided that prior to, or simultaneous with the notice of suspension, he/she serve a copy of the charges upon which the suspension is based on the suspended officer and provided further that ... a hearing on the charges [is held] within 20 days from the date of the suspension.

mine his relevance as a witness before calling him, a process they explained to plaintiff. When plaintiff refused to divulge his questions, the subcommittee did not call the secretary-treasurer as a witness. Pl. Exh. 10 at 58–63, 77. Plaintiff also objected to the submission of the correspondence between Leitz and himself without the opportunity to cross-examine, stating "I didn't object [to the charge of conflict]. I asked him to explain what he meant by conflicts. If he would have explained that to me at the time, perhaps this whole thing would have been avoided. In my opinion I wasn't in conflict." Pl.Exh. 10 at 76.

Pursuant to the hearing subcommittee's report, the International Executive committee removed plaintiff as a vice-president on September 27, 1990. Pl. 3(g) ¶ 11; TWU 3(g) at ¶ 15. The subcommittee had found that:

> William Kirrane while an International Vice–President of TWU and a member of its highly responsible International Executive Council which deals with its most intimate and, in many cases, its most confidential business, offered his services, at a price, to assist other unions in their most intimate affairs. There are many situations where the interests of TWU conflict with the interests of other unions. There are situations where the interests of one TWU Local conflict with the interests of another TWU Local.
>
> This committee submits that it is grossly unbecoming for an International Vice–President and member of the International Executive Council to offer his professional assistance in union matters, presumably to the highest bidder among other unions or among locals of the TWU.
>
> . . . .
>
> Brother Kirrane's deliberate failure to request permission from the International President, or even to notify him, of his solicitation of union business from TWU Locals and from other unions was an indefensible breach of his constitutional responsibility as a Vice–President.
>
> It is the unanimous opinion of this Subcommittee that the good and welfare

of the TWU requires that Brother Kirrane be removed.

Pl.Exh. 11 at 12–13.

## B. *Discussion*

Section 101(a)(5) of the Act requires that a union member be "afforded a full and fair hearing" before the member can be disciplined. These requirements include notice of the specific charges brought and a reasonable opportunity to be heard, including such procedural rights as the right to present evidence and cross-examine witnesses, as well as an impartial hearing panel. *See Loekle v. Hansen* (S.D.N.Y. 1982) 551 F.Supp. 74, 82 (Carter, J.) (noting standard for hearing and ruling that trial was "so unfair that it does not satisfy the requirements of § 101(a)(5)"). Plaintiff attacks the hearing he received as a procedural and substantive "sham," and the decision reached by the hearing subcommittee as unreasonable.

Nothing in the record before us raises a disputed issue of fact with respect to plaintiff's claim that the hearing itself was defective, apart from plaintiff's conclusory and self-serving allegations to that effect.[7] The letter suspending plaintiff specifies the charges against him; and scheduling a hearing within the 20–day period required by the TWU constitution satisfies the notice requirement. Plaintiff was given copies of every piece of documentary evidence that was used against him, which consisted largely of correspondence to which he was a party. And though plaintiff alleged bias and repeatedly objected to the procedures used, those objections were without substance, and the hearing transcript reveals no bias and none of the flaws similar to those that infected the hearing in *Loekle*.

Turning to the decision the hearing subcommittee reached, we observe that there is no dispute whatsoever as to the basis of the charges upon which plaintiff was removed from office. Plaintiff mailed out leaflets promoting his consulting firm, Modern Labor Methods and the TWU ruled that this conflicted with his responsibilities

---

7. *See Supra,* note 3.

as an International vice-president and constituted conduct unbecoming that position. In determining whether the TWU erred in so ruling we must give great deference to the union's interpretation of its own constitution, and would upset its interpretation only if "patently unreasonable." *See Gurton v. Arons* (2d Cir.1964) 339 F.2d 371, 375; *Stelling v. Int'l Broth. of Elec. Workers* (9th Cir.1978) 587 F.2d 1379, 1388, n. 10 (reiterating the "patently unreasonable" standard and suggesting court review union's interpretation from the perspective of the union, not the court).

Essentially, plaintiff's argument against the TWU's conclusion that his behavior violated the constitution boils down to this: "Modern Labor Methods was never more than name and a leaflet" and his consulting work never more than "anticipated"; thus it is unreasonable to be "disciplined for impure thoughts." Pl.Mem. at 12–13. Plaintiff also alleges that his removal was part of the plot to keep him off the Local 101 election ballot, a claim we resolved against him in our earlier opinion. *See* November 5, 1990 Memorandum and Order at 7. However, plaintiff offers no caselaw, nor specifies any incidents either before, during, or after the hearing that allows us to agree with his claim that the TWU was unreasonable in ruling as it did. We therefore grant defendants' motions to dismiss the complaint as to the issue of plaintiff's removal as International vice-president.

### 3. *Plaintiff's Status as a Member of Local 101*

#### A. *Facts*

Shortly before the events that lead to plaintiff's termination as vice-president, he declared his intention to run for president of Local 101.[8] In September, prepatory to his candidacy, plaintiff sent Local 101 a check for his union dues, which was returned with the advice that as a result of his hearing before the TWU, he might be ineligible for TWU membership. However, no protest having been filed against plaintiff's candidacy, the Local 101 election committee ruled him eligible and so informed him on November 1, 1990. Pl. 3(g) at ¶ 13–15, 17; Local 101 3(g) at ¶ 22 (election committee ruling on plaintiff's candidacy).

Later that day, anticipating that this decision might be challenged, the election committee sought an interpretation of the TWU constitution's membership provisions from Leitz, whose rulings as president with respect to the union constitution "shall be deemed true and proper and shall be given full force and effect." *Id.;* Leitz Aff., Exh. 1 at 8. Leitz ruled that "to be eligible for membership, a person must either be employed in an industry within the jurisdiction of the Union, or hold an office or staff position in a Local or in the International Union." Pl.Exh. 15.

On November 6, a third candidate for president made the anticipated challenge to plaintiff's eligibility. At the conclusion of long arguments by each of the candidates, and a two hour debate, the election committee ruled plaintiff ineligible, citing Leitz's interpretation and plaintiff's non-employment in the industry and non-status as either officer or staff member of a local or the TWU.[9] 3(g) at ¶¶ 22–23.

Plaintiff opened a second front in his battle to stay on the Local 101 election

---

**8.** Defendant Spinowitz, president of Local 101, states that plaintiff announced his intention to run against her in late July, 1990, after earlier (March or April) discussing the possibility of his running on her ticket for secretary-treasurer of the local. Local 101 3(g) at ¶ 16–17. Again, for the purposes of this motion, we will accept plaintiff's version of the events.

**9.** We note in passing that Local 101's interpretation of our November 5, 1990 Memorandum and Order, which apparently "influenced" the committee, is in error. Local 101 3(g) at ¶ 22, at ¶ 16. We did not find that "for now Kirrane has not made a showing that his removal from office was in retaliation against free speech activities in TWU," but rather that the TWU was not involved in the challenge to plaintiff's candidature. Thus we stated that:

> We assume for present purposes that plaintiff's allegations against the International are valid and that the latter's conduct has been outrageous. However, plaintiff's own testimony established that the Local has been

ballot by filing an Order to Show Cause that we signed on October 19, 1990. He sought leave to file an amended complaint adding Local 101,[10] and requested a preliminary injunction against their preventing his bid for president because he had allegedly lost his union membership. We denied the application for an injunction by Memorandum and Order of November 5, 1990 on the grounds that it was a claim under Title IV of the Act and, as such, we did not have jurisdiction to act on it. Plaintiff subsequently filed a complaint with the Department of Labor protesting the Local 101 election and his exclusion from participating in it as a candidate. On May 23, 1991, the Secretary, based on that complaint, filed suit against Local 101 in the Eastern District of New York. On August 21, Plaintiff intervened in that action. Plaintiff's petition alleged, *inter alia:*

3. On or about November 1, 1990, defendant [Local 101] unlawfully and in violation of [the] Act excluded intervenor's name from the ballot for the subject election.

4. Thereupon, intervenor filed an action in ... the Southern District of New York ... in which he seeks to establish his rights as a member of the such Union, including, *inter alia,* his right to run for office.

5. ... The District Court ... held that one of intervenor's membership rights, namely his right to run for office, was within the exclusive jurisdiction of the Labor Department ...

6. Accordingly ... intervenor filed a complaint with the Secretary of Labor alleging that he was unlawfully stricken from the ballot in the election for officers of Local 101 [and] the Secretary of Labor filed this action.

nothing but supportive of him in his dispute with the International and there is nothing before us even remotely to suggest that the International was involved in initiating any challenge to his right to be a candidate in the upcoming election.
Memorandum and Order, at 7.
However, this misunderstanding of our former position in no way affects the motions before us.

Pl.Compl. in Intervention in Cv. 91–1871 (E.D.N.Y.).[11]

## B. *Discussion*

Plaintiff has presented nothing that moves us to depart from our earlier jurisdictional analysis with respect to our power to adjudicate his claim against Local 101. As we then observed:

if plaintiff in the guise of a Title I claim has alleged what is instead a violation of a Title IV right, we are without jurisdiction to entertain his application.

... [W]e note at the outset that, notwithstanding plaintiff's attempts otherwise to characterize the relief requested, he is seeking an injunction which in substance will make unlawful an attempt by the Local to declare plaintiff ineligible to run for office by reason of his loss of membership in the Union. We further note that § 101(a)(1) of Title I, upon which plaintiff bases his claim for relief, makes no mention of eligibility to run for office or any right a member may have thereto. However, Title IV does.... It would appear ... that plaintiff's claim arises not from Title I but from Title IV.

November 5, 1990 Memorandum and Order at 5–6.

Plaintiff's goal in seeking a declaration that he is a member in good standing in the union remains unchanged from when we so held. Moreover, assuming such analysis to have been flawed, there can be no doubt that every question plaintiff now seeks to bring before us can be determined in the Eastern District action brought by the Secretary of Labor, whose jurisdiction is concededly broader than ours. Accordingly, as a matter of law and in the exercise of

**10.** Plaintiff had filed his complaint against the TWU on September 21, 1990; that complaint did not name Local 101.

**11.** We hereby make this complaint part of the record of this case.

our discretion, we dismiss the claim against Local 101.

SO ORDERED.