Thomas J. MILNE

v.

INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS, AFL–CIO LOCAL 15.

No. 3:99CV911 JBA.

United States District Court, D. Connecticut.

Feb. 2, 2001.

Leon M. Rosenblatt, Lynn M. Mahoney, West Hartford, CT, for Plaintiff.

Robert M. Cheverie, Cheverie & Associates, John T. Fussell, Robert M. Cheverie & Assoc., PC, East Hartford, CT, for Defendant.

## RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT [DOCS. ##19, 31]

ARTERTON, District Judge.

On July 11, 1996, defendant International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers, AFL–CIO, Local 15 ("the Union") held a disciplinary hearing on harassment charges filed against plaintiff Thomas Milne by Michael Coyne, the financial secretary and chief executive officer of the Union, and imposed a $10,000 fine against plaintiff. Milne claims that the procedures used in connection with the imposition of this disciplinary fine violated his procedural due process rights under the Labor–Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. §§ 411, et. seq., and that the fine was excessive and imposed in retaliation for his exercise of LMRDA protected rights, in violation of 29 U.S.C. § 529.

Defendant has moved for summary judgment on both counts [Doc. # 19]. Milne has cross-moved solely on his procedural due process count, Count One [Doc. # 31]. For the reasons discussed below, Milne's motion for summary judgment on Count One is granted. Defendant's motion for summary judgment is denied as to Count One and granted as to Count Two, the retaliation count.

## I. BACKGROUND

During the weekend of May 18 and 19, 1996, Coyne was at his vacation house in Windham, Vermont with his family and friends celebrating his son's college graduation. Coyne claims that on the morning of May 18, 1996, he observed Milne and Lloyd Etkin, a retired Local 15 member and former political opponent of Coyne, in front of his property. Etkin was operating a video camera and Milne was using a 35mm camera. A heated exchange en-

sued, and Coyne ordered Milne and Etkin off his property. Coyne's family called the police, at his request, and Coyne filed an incident report with the Vermont State Police after Etkin and Milne left. The next day, at approximately 5:30 a.m., Coyne was awakened by the sound of Milne's vehicle in front of his house, and he observed Milne's car in his driveway. Coyne's son called the police, and went outside with a rifle and told Milne to leave. Milne left, and Coyne again reported Milne to the Vermont State Police. After he returned to Hartford, Coyne filed a report with the Hartford Police Department. *See* Deposition of Michael Coyne ("Coyne dep.") at pp. 23–26, 28–33, 36–38, 41–43.

Milne claims that he went to Vermont with Etkin to document and observe Coyne's personal use of the union vehicle, and that he believed that the union policy did not permit personal unlimited use of the vehicle. *See* Deposition of Thomas Milne ("Milne dep.") at pp. 108–09. Etkin, however, believed the purpose of the trip was to go to an antique car show and to see Milne's trailer, and that they only decided to take pictures after they saw the union car at Coyne's home. *See* Deposition of Lloyd Etkin at p. 28. Milne claims that they never went onto Coyne's property, that he never left the car or spoke to Coyne, that he did not harass or try to intimidate Coyne, and that Coyne threatened Etkin and him. *See* Milne dep. at pp. 110–23. According to Milne, he returned to Coyne's house alone at 5:30 a.m. on May 19 in order to take better pictures of the vehicle. *See id.* at pp. 120–23. Milne characterizes himself as a vocal critic and political opponent of Coyne, and a longtime critic of the personal use of union vehicles by union officials, but offers no evidence of any occasion on which he publically addressed this issue apart from one

meeting in the 1970s. *See id.* at pp. 44–48, 65, 76–77, 92–101. It is undisputed that Milne has not brought the issue of personal use of union cars by executives to any union meeting since the 1970s, and has not filed any grievances about this issue. *See id.*

On June 6, 1996, Coyne filed an internal union charge against Milne, claiming that Milne had "harass[ed] myself, my family, other relatives and guests at my vacation home in Windam, Vermont on May 18 and May 19, 1996," in violation of a union member's obligation under Article XXVI, § 18 of the International Constitution's to not "knowingly wrong a member of this Union."[1] Doc. # 26, Pl.'s Ex. N. The Union's notice of this grievance to Milne dated June 27, 1996 stated that "you are hereby notified to appear before the Executive Committee of Local Union No. 15 . . . on 11 July 1996 . . . with such witnesses as you desire to produce in your defense and to have a member of your Local Union act as your counsel should you so desire." *Id.* Milne states he was working ten hours a day, six days a week at the time, and thus requested that the Union postpone the hearing, which request the Union denied. *See* Milne dep. at pp. 150–51, 167. Patrick Broderick, the then-President of Local 15, disputes that Milne ever asked him for a postponement of the trial. *See* Deposition of Patrick Broderick ("Broderick dep.") at pp. 47–48.

On July 11, 1996, Milne appeared at the executive board meeting as instructed.

Plaintiff claims not to have understood that the trial would be held that night; instead, he believed that they would discuss the charges, but he could not "foresee" what would happen. *See* Milne dep. at pp. 157–60. He had not yet been asked to elect a jury trial or a trial to the Union's Executive Board, as allowed under the union constitution.

According to Local president Broderick, on July 11, 1996, Coyne was asked into the hearing room first to explain why he had filed charges against Milne. Milne was not permitted to be present to hear Coyne's explanation. *See* Broderick dep. at pp. 34–35. Coyne was then asked to leave the hearing room, and Milne was brought in. *See id.* at p. 35. Milne was asked his name and book number, but he refused to answer. *See id.* at pp. 35–36. Milne.was then asked whether he wanted to be tried by a jury of the membership or the Executive Board, and he again refused to answer. *See id.;* deposition of Brandon Johnson at p. 56. Milne disputes that he was ever asked if he wanted to be tried by a jury or the Board. *See* Milne dep. at p. 40.

The Board then directed Milne to leave the room and the executive board members discussed among themselves how to proceed; the Board decided that if Milne refused to cooperate, he would be tried in absentia. *See* Broderick dep. at p. 36. According to the Union, Milne was then asked back in, and was told that the Board would try him in absentia if he would not

---

1. Article XXVI, § 18 (obligation of members) provides: "I (give name) hereby solemnly and sincerely pledge my honor that I will not reveal any private business or proceedings of this Local Union or of the International Association, or any individual actions of its members; that I will, without equivocation or evasion, and to the best of my ability, abide by the Constitution and By–Laws, and the particular scale of wages adopted by it; that I will

abide by the will of the majority; that I will at all times, by all honorable means within my power, procure employment for members of this Union and that I will at all times be respectful in word and action to every person, and be considerate of widows, widowers, orphans and the weak and defenseless; and that I will not knowingly wrong a member of this Union or see one wronged if it is within my power to prevent the same."

cooperate. *See id.* Milne continued to be non-responsive. The Board asked him again whether he wanted to be tried by a jury or the Board, and Milne responded that he had nothing to say. *See id.* at p. 37. According to Broderick, at least one member urged Milne to speak up and defend himself, but Milne made no response. *See id.* at p. 50. Broderick claims that he again told Milne "that he would be tried in absentia, he could wait in the day room for the result or he could get it by mail." *Id.* at p. 37. Milne "said he would wait." *Id.*

Milne, however, claims that when he was told to step outside a second time, after he refused to answer the Board's questions, he was not told that the trial would proceed without him, and that Broderick later came out and told him that "if I didn't have anything to say I might as well go home and they would notify me by mail." Milne dep. at pp. 161–62. At that point, Milne claims, he realized they were trying him, and he told Broderick that "you can't be trying me if that's the case and I'm sitting out here." According to Milne, Broderick's response was, " 'I said if you don't have anything to say, you might as well go home and we will notify you by mail of the outcome.' " *Id.*

Although there is a dispute about when Milne learned that the trial was proceeding in his absence, it is undisputed that upon realizing that the trial was proceeding, Milne did not tell Broderick or any other members of the Board that he had anything to say. *See id.* It is also clear from the undisputed testimony of Milne and Broderick that the Union never offered Milne the opportunity to remain in the room to listen to Coyne's testimony, to cross-examine Coyne or to hear the other evidence. *See* Milne dep. at p. 146; Broderick dep. at pp. 36–37. At oral argument, defendant's counsel confirmed the Union's position that once Milne refused to

participate, the Union had no choice but to try him in absentia.

Thus, the hearing on Coyne's grievance proceeded in Milne's absence, Coyne testified as to his version of the events, and affidavits from some of Coyne's family members and the Hartford police report were received into evidence. *See* Coyne dep. at 91, 93. The Board then deliberated and unanimously found Milne guilty of knowingly wronging a member of the Union. *See* Broderick dep. at 37.

The Board voted 4–1 that evening to fine him $10,000. Milne appealed the decision of the Executive Committee to the International Union, which affirmed the decision of the Executive Committee in March 1997. He also filed unfair labor practices charges with the National Labor Relations Board (NLRB) against Local 15 and the International Union concerning Coyne's charge and the conduct of the trial. These charges were dismissed by the NLRB. In June 1997, the International informed Milne of his obligation to pay the fine and advised that his failure to do so would jeopardize his continued union membership. After Milne made no payment toward his fine, the International expelled Milne in August 1997 for failure to meet his financial obligations to the Local.

## II. DISCUSSION

### A. *Summary judgment*

A court shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Silver v. City Univ.*, 947 F.2d 1021, 1022 (2d Cir.1991). The moving party bears the initial burden of establishing that no genuine issue of material fact ex-

ists and that the undisputed facts show that she is entitled to judgment as a matter of law. *Rodriguez v. City of New York*, 72 F.3d 1051, 1060 (2d Cir.1995). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988).

The non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. A party seeking to defeat a summary judgment motion cannot "rely on mere speculation or conjecture as to the true nature of facts to overcome the motion." *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir.1995) (*quoting Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "If the evidence is merely colorable, ... or is not significantly probative, ... summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted); *see also Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348 (material dispute requires more than "metaphysical doubt").

█ When considering cross-motions for summary judgment, neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it, and the Court is not required to grant judgment as a matter of law for one side or the other. *See Schwabenbauer v. Board of Educ. of Olean*, 667 F.2d 305, 313 (2d Cir.1981). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* at 314.

### B. Procedural due process

The Labor–Management Reporting and Disclosure Act of 1959 ("LMRDA"), § 101(a)(5), 29 U.S.C. § 411(a)(5), provides that:

> No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

Milne contends that the text of the charge and the hearing procedures violated all three prongs of the LMRDA, and that the $10,000 fine imposed was therefore unlawful. The Union argues it is entitled to summary judgment and Milne's cross-motion must be denied because, as a matter of law, no procedural due process rights were violated as Milne received an opportunity for a full and fair hearing, waived his right to confront his accusers and cross-examine the witnesses against him by refusing to participate in the hearing, and had adequate time to respond given the specific nature of the charges against him. In response, Milne claims that even accepting the Union's characterization of the facts, his procedural due process rights were violated as matter of law because the charges were impermissibly vague, he was given inadequate time to prepare his defense and he was not given

an opportunity to confront and cross-examine witnesses against him, or alternatively, that there are material facts in dispute that preclude a grant of summary judgment in favor of the Union, such as whether the notice was adequately specific, whether he had reasonable time to prepare, given the reason for his two unsuccessful requests for postponement, and whether he knowingly waived his right to confront and cross-examine his accusers.

Because this Court finds that the Union's decision to try Milne in absentia once he refused to participate violated his right to a full and fair hearing by denying him the right to confront and cross-examine the witnesses against him, plaintiff is entitled to summary judgment on this count. Having so found, the Court does not reach Milne's other procedural due process claims.

■ Under the LMRDA, 29 U.S.C. § 411(a)(5)(C), discipline may be imposed only after the union member has been afforded a "full and fair hearing." "This means that traditional concepts of due process should apply. The elements of such a 'fair hearing' generally encompass full notice and a reasonable opportunity to be heard—including the right to present evidence and the right to confront and cross-examine witnesses." *Loekle v. Hansen*, 551 F.Supp. 74 (S.D.N.Y.1982) (citing *Kuebler v. Cleveland Lithographers*, 473 F.2d 359, 364 (6th Cir.1973); *Reilly v. Sheet Metal Workers' Int'l Ass'n*, 488 F.Supp. 1121, 1125 (S.D.N.Y.1980); *Parks v. International Brotherhood of Electrical Workers*, 314 F.2d 886, 912 (4th Cir.1963); *Yochim v. Caputo*, 51 L.R.R.M. 2516, 2517 (S.D.N.Y.1962), internal quotations omitted).

■ It is undisputed that Milne was never present while the hearing was held and had no opportunity to hear Coyne's testimony, cross-examine Coyne or rebut other evidence offered to the Board. The Union claims that given Milne's familiarity with the procedures for union hearings from his past disciplinary hearings, his refusal to answer basic questions or to elect a trial by a jury of the membership or by the Executive Board, effectively waived his rights under the LMRDA, and thus the trial in absentia was permissible. Milne argues that even accepting the facts as the Union presents them, as a matter of law his LMRDA procedural due process rights have been violated. The Court agrees.

"The courts have uniformly recognized that the right of confrontation and cross-examination of witnesses is fundamental to the 'full and fair hearing' requirement. They have also uniformly declared that union members who knowingly fail to exercise rights guaranteed or offered them in connection with union disciplinary proceedings have waived those rights." *Ritz v. O'Donnell*, 566 F.2d 731, 735 (D.C.Cir. 1977) (citation omitted). In *Ritz*, the court found waiver of the right to cross-examination where the plaintiff had been repeatedly informed of his right to call for the appearance of the charging parties and to cross-examine them, and the plaintiff had "indicated, expressly or tacitly, that he was not making any such request, even though he stated his awareness of his right to do so." *Id.* at 735.

Unlike Milne, the plaintiff in *Ritz* was present during his hearing, although the charging parties did not attend due to other union business. *See id.* A union official representing the charging parties "offered several times to produce for cross-examination any persons requested by plaintiff." *Id.* Moreover, the court held that given the particular facts of the case, "even if plaintiff's course did not constitute a waiver of his right of confrontation and cross-examination," he nonetheless re-

ceived a full and fair hearing because "the entire case against [the plaintiff] was proved by written documents, the authenticity of which [the plaintiff] conceded; there were no witnesses for him to cross-examine; and there is no suggestion of any claim made that he had any request or need to call the accusing parties in order to present some kind of affirmative defense." *Id.* at 736.

In contrast, in *Schermerhorn v. TWU Local 100,* 1995 WL 677092, 150 LRRM 2246, 2250–51 (S.D.N.Y.1995), *aff'd* 91 F.3d 316 (2d Cir.1996), the court found no waiver of the right to cross-examine and a denial of the right to a full and fair hearing where the union trial committee adopted a procedure for conducting hearings in which each witness would give his or her testimony outside the presence of the plaintiffs, and cross-examination would be deferred until the end of all the testimony. The plaintiffs were not permitted to be present during the testimony, despite plaintiff's evidence that they had not agreed to this procedure, and that they had asked whether they would be allowed to confront their accusers and cross-examine them. *Id.* at 2247–48. After days of testimony, the plaintiffs then received a notice informing them that they should attend the hearing to present their testimony and evidence, and to cross-examine any witnesses, including those who had previously testified. The notice further stated that plaintiffs should notify the union in writing of the names of any testifying witnesses that they planned to cross-examine. *Id.* at 2248. Neither plaintiff submitted a list of names to the union. The plaintiffs also claimed that they had requested a tape recording of the prior testimony but that the sound quality was bad, the hearings were not fully recorded and one plaintiff claimed that she did not receive the tapes at all. *Id.* at 2249.

Noting that waiver of the right to confrontation and cross-examination " 'is not to be lightly implied,' " the court concluded that on these facts, the plaintiffs had not been given a full and fair hearing. *Id.* at 2250 (*quoting Loekle v. Swayduck,* No. 75 Civ. 3056, 1976 WL 1558, at *5–6 (S.D.N.Y. Nov. 4, 1976)). Because the plaintiffs had not been permitted to attend the hearing while their accusers spoke against them and did not receive a complete recording or transcript of the proceedings, the court concluded that therefore "it is unlikely that they were able to conduct an adequate cross-examination of witnesses whose complete testimony they had not heard." *Id.* at 2250. Although defendant claimed that plaintiffs had agreed to the procedures, thereby waiving the rights to confrontation and cross-examination, the court found that the plaintiffs had not done so, crediting their objections to the procedures used by the union, their subsequent request to cross-examine the witnesses against them and the ambiguity of the union notice requiring that they identify in writing the witnesses they wished to cross-examine. *See id.* at 2250–51.

Here, unlike the proceedings in *Ritz,* the issue before the Executive Board turned entirely on Coyne's credibility and the adequacy of proof that Coyne had been "wronged" by Milne within the meaning of the constitution or its previous construction and application. And unlike the plaintiff in *Ritz,* Milne was never offered an opportunity which he rejected to confront the charging party. Had Milne been permitted to remain in the room during the hearing, he would have had an opportunity to listen to Coyne's and others' versions of the events and would be present to dispute them, if he chose to do so. As in *Schermerhorn,* by refusing to let Milne remain in the hearing room, the Union denied Milne any opportunity to confront the witnesses

against him, and it is undisputed that Milne had no opportunity to cross-examine Coyne. It is further undisputed that Milne had no knowledge of any written statements or other evidence Coyne submitted to the Board. Thus, if Milne did not knowingly waive these rights, he was denied a full and fair hearing and his due process rights under the LMRDA were violated. The question on summary judgment, therefore, is whether the fact that Milne refused to answer preliminary pro forma questions or to elect the form of trial, and stated that he had nothing to say, even after he was informed that the trial would proceed against him in absentia, constitutes a "knowing waiver."

Based on the summary judgment record and drawing all reasonable inferences and resolving all ambiguities in favor of the Union, this Court finds as a matter of law that Milne did not knowingly waive his rights to hear the evidence against him and confront and cross-examine the witnesses against him. Even before Milne announced his refusal to speak, he had been excluded from hearing Coyne's explanation to the Board of why he brought charges against Milne. The Union concedes that Milne was never given copies of the statements from witnesses or the police reports that Coyne read at the hearing until years after the hearing and the appeal process were concluded. Milne therefore had no ability to make an informed choice about whether to respond to this evidence or remain silent. Milne, having subsequently learned that Coyne testified in the hearing that plaintiff trespassed on his property, got out of his car and made threatening remarks to Coyne, denies the truth of those allegations. Had he been present while they were made, Milne could have elected whether to rebut them through his own testimony or cross-examination, or remain silent.

Because he was denied any opportunity to hear the evidence against him, Milne cannot be said to have waived his right to rebut the evidence and confront witness testimony by his *pre-hearing* refusal to respond to preliminary Board questions or to elect the form of his tribunal. The Court's conclusion that plaintiff's knowing waiver cannot be based on prior unresponsiveness under these circumstances is strengthened by the lack of any explanation from the Union as to why Milne could not simply have been permitted to remain in the boardroom during the evidentiary proceeding, notwithstanding his prior refusal to answer, such that any continued silence or non-participation on his part would have been with full knowledge of what the evidence against him was.

■ The Union's evidence of Milne's prior familiarity with the Union grievance procedures shows that he had been tried in absentia after he failed to attend his hearing in the past. This result was also warned of in the charge here and in the June 27 letter notifying Milne of the July 11 hearing, which advised that "[i]n the event you fail to appear, the trial on the charges filed against you will proceed in your absence." While this demonstrates Milne's knowledge that the hearing would proceed in his absence if he did not attend, it is irrelevant to his claimed waiver once he did attend and it is undisputed that he attended. Similarly, Milne's refusal to elect the form of tribunal is irrelevant as evidence of waiver of confrontation and cross-examination rights.

Unlike the plaintiffs in *Schermerhorn* who were alleged to have knowingly waived the right by agreeing to procedures that the court found violated their due process rights, the Union has offered no evidence showing that the subject of confrontation and cross-examination of witnesses ever came up, or that Milne was

given an opportunity to confront or cross-examine the witnesses against him after the hearing began; indeed, it excluded him from any opportunity to hear such testimony or see exhibits. *See Loekle,* 1976 WL 1558, at *5, 1976 U.S. Dist. Lexis 12456, at *13 (noting that whether member is informed that he has procedural due process rights is important to the question of whether he knowingly waived those rights). Nor has it offered any evidence showing that it made any inquiry as to whether his pre-hearing non-responsiveness was intended by Milne to mean that he did not intend to cross-examine any witnesses, a decision which could require hearing their testimony first. Thus, the Union has failed to show facts from which it could be inferred that plaintiff knowingly waived either the right to cross-examination or confrontation by refusing to participate in the initial hearing preliminaries. The evidence, when viewed in the light most favorable to the Union, shows that the Union's requiring Milne to leave the hearing room after he refused to cooperate with their preliminary questioning and trying him "in absentia" violated plaintiff's LMRDA due process rights and Milne is entitled to summary judgment on this Count.

### C. *Retaliation for protected speech*

The Union has also moved for summary judgment on Milne's claim that he was disciplined for engaging in protected speech in violation of the LMRDA, 29 U.S.C. § 529. Section 529 provides that:

It shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this Act.

The Union claims that it is entitled to summary judgment on this claim because the activity for which Milne was disciplined was harassing Coyne and his family, not protected speech. The Union asserts that the Executive Committee was aware that officials made personal use of union cars, that Milne never questioned Coyne about his use of the car, that Milne's return to Coyne's residence on May 19 after he had already documented the presence of the car and the police had been called the previously day was unprotected harassment, and that Milne's failure to make any issue of Coyne's use of the car at any union meeting until he was expelled in August 1997 leaves the undisputed inference that Milne's "true purpose in traveling to Vermont was to harass, intimidate, and threaten Mr. Coyne and his family." *See* Doc. # 20 at 27–28.

In response, Milne asserts that because a jury could find that his conduct was legal and it was "directly tied to his legitimate and protected efforts to stop Coyne from what he perceived as improper use of the union's resources," a material dispute exists as to whether his activity was protected speech. Doc. # 25 at 9. However, Milne does not dispute that he did not raise the issue of Coyne's use of the car to the Board in defense of his activities or that he had ever raised the issue publicly since the 1970s. Milne further claims that the evidence could support a finding that the imposition of the $10,000 fine was excessive and retaliatory, but does not put forth any evidence from which it could be inferred that the Board's decisions were based on any retaliatory motive.[2]

2. Although Milne's opposition to defendant's motion for summary judgment treats the claim that the fine is excessive in violation of due process independent from the retaliation question, *see* Doc. # 25 at 17–18, his argument that the fine is excessive rests solely on

" 'The LMRDA of 1959 was designed to protect the rights of union members to discuss freely and criticize the management of their unions and the conduct of their officers. The legislative history and the extensive hearings which preceded the enactment of the statute abundantly evidence the intention of the Congress to prevent union officials from using their disciplinary powers to silence criticism and punish those who dare to question and complain.' " *Ruocchio v. United Transp. Union, Local 60*, 181 F.3d 376, 384 (3d Cir.1999) (*quoting Salzhandler v. Caputo*, 316 F.2d 445, 448–49 (2d Cir.1963)). To effectuate this goal, section 411(A)(1) of the LMRDA provides that:

> Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions, and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

"To establish a prima facie case of retaliatory discipline in violation of the LMRDA, a plaintiff must prove that: (1) his conduct constituted 'free speech' under the LMRDA; (2) that the speech was a

cause for the Union taking action against him; and (3) damages." *Hussein v. Hotel Employees and Restaurant Union*, 108 F.Supp.2d 360, 366 (S.D.N.Y.2000) (*citing Black v. Ryder/P.I.E. Nationwide, Inc.*, 970 F.2d 1461, 1469 (6th Cir.1992)); *accord Commer v. McEntee*, 121 F.Supp.2d 388, 396 (S.D.N.Y.2000). Where "discipline is imposed on the basis of a combination of factual allegations an essential element of which is protected speech, the discipline as a whole is invalid under the LMRDA." *Petramale v. Local No. 17 of Laborers Int'l Union of N. Am.*, 736 F.2d 13, 16 (2d Cir.1984).

██ Milne's argument in opposition to summary judgment misconceives both the nature of the charges filed against him and the nature of the protection created by the LMRDA. Milne correctly asserts that "[a] union member has the right, unfettered and without fear of disciplinary reprisal, to criticize his union leadership even if the criticism is libelous." Doc. # 25 at 8. However, as there is no basis here for any inference that Milne was disciplined for engaging in protected activity, the Court agrees with the Union that the discipline imposed against plaintiff did not violate the LMRDA's anti-retaliation provision.

The record shows that the Board heard evidence that Coyne and his family were extremely upset by Milne's and Etkin's presence in the driveway of their vacation home and Milne's predawn presence the next morning, and that Coyne found them sufficiently threatening to call the police twice, and, absent any evidence from Milne to the contrary, concluded that Milne had violated the union constitution by having knowingly wronged a member of the Union by harassing, intimidating or threaten-

---

his claim that "[i]f retaliation against the plaintiff for exercising his protected rights was a material part of the defendant's motivation [in imposing such a large fine], the defen-

dant will have violated the LMRDA." *Id.* at 17. Therefore, this argument will be considered in analyzing the retaliation claim.

ing Coyne and his family. Even assuming that Coyne's account of the events was inaccurate, as Milne now contends, he offers no evidence from which an inference could be drawn that the Board had reason to suspect that Coyne's description of the events was untrue.

Moreover, assuming that Milne's purpose in going to Coyne's house Vermont was to document Coyne's personal use of the union car, and Milne did not trespass or threaten Coyne on May 18 and 19, 1996, factual questions that Milne contends are critical to this motion, the undisputed fact remains that Milne did not inform Coyne or the Board that this was his purpose and never raised the issue of personal use of union cars by officers generally before the Board or any other union body before the disciplinary action was taken against him. Notwithstanding Milne's vague and conclusory allegations of "ongoing" opposition to Coyne and the use of union cars, the sole evidence in the record of any prior public speech on this issue is Milne's statement that he raised the issue once at a board meeting in the 1970s. *See* Milne dep. at 45, 94–101. There is thus no evidence from which a reasonable factfinder could infer that the Board considered any alleged expressive purpose of plaintiff when it conducted the disciplinary proceedings against him in 1996 and imposed the $10,000 fine. Further, nothing in the record permits any inference that the Board considered Milne's previous political opposition to Coyne in adjudicating the harassment charge.

In *Commer v. McEntee*, 121 F.Supp.2d 388 (S.D.N.Y.2000), the court rejected a union president's claims that discipline imposed on him by the union for authorizing mailings in the name of the Local without obtaining prior approval as required by the union constitution violated the LMRDA because the president failed to demonstrate that the speech was a cause of the union's discipline. The court noted that "although Commer alleges that he was punished because of his ongoing dissent with the union, he has shown no connection between the panel's decision and that speech activity. Rather, he relies on the generalized contention that, since his vociferous criticism necessarily would have created animus towards him within the [International] hierarchy, the discipline rendered against him must have been motivated by that animus." *Id.* at 398.

In contrast, in *Bradford v. Textile Workers of Am., AFL–CIO, Local 1093*, 563 F.2d 1138 (4th Cir.1977), relied upon by Milne, the court held that the question of retaliation was properly submitted to the jury where the union claimed that it had removed the plaintiff from office because of his failure to attend an executive board meeting, but it was undisputed that the removal because of this non-attendance "was invalid under the International Constitution and By–Laws ... [a]nd it would seem implausible to assume that the defendant's Executive Board did not know this from the outset ...." *Id.* at 1142. Further, the plaintiff had submitted evidence showing that:

> in connection with the decision to remove the plaintiff from office, there was discussion of the activities of the plaintiff within the Local, of his repeated conflicts with the president and the Executive Board over union activities, of the charges of dereliction sponsored by him against such officers and of other criticisms .... Moreover, there was no dispute that the plaintiff had actively and vigorously opposed the president of the Local and certain members of the Executive Board at the time they were elected and had already begun active work in opposition to their reelection at the impending election. Because of all this

activity by the plaintiff ... the higher officers of the Local, who dominated the Executive Board, were definitely, if not fiercely, hostile to the plaintiff and in a mood to seize on any opportunity to punish him in retaliation for this activity. This hostility was reflected in the characterization of the plaintiff by the president of the union as a "mad dog."

*Id.* This case is easily distinguished from the facts here.

As in *Commer* and unlike *Bradford,* Milne offers no evidence of any causal connection between the discipline imposed and his alleged stance on the personal use of union vehicles or his previous political opposition to Coyne and support of Coyne's rival, Etkin. Although the Court has found that the Executive Board's refusal to permit Milne to remain present while Coyne gave his evidence and other witness statements were submitted violated Milne's due process rights, there is no evidence showing Executive Board hostility toward Milne, and certainly nothing that suggests that the Board was motivated by desire to retaliate against Milne for what he claimed, after the fact, was his opposition to Coyne's union car use. Indeed, according to undisputed testimony of members of the Board, they urged Milne to defend himself and were frustrated by his refusal to speak or otherwise participate in the proceedings. Further, in the face of plaintiff's silence, and absent any evidence that plaintiff had made union car personal use an issue with the Union after the 1970s, it is simply too attenuated as a matter of law for a reasonable juror to infer retaliatory animus from plaintiff's prior "gadfly" union activism alone.

█ Finally, although the Board voted to impose the maximum fine of $10,000, the undisputed evidence shows that its purpose was to emphasize the seriousness of the charge, with the understanding that the International might reduce the fine. *See* Bonadies dep. at 23. In the absence of any evidence of a retaliatory purpose, this Court will not second-guess the Executive Board's decision-making process in imposing the maximum fine. *See Phelan v. Local 305,* 973 F.2d 1050, 1055 (2d Cir. 1992) ("Congress did not intend Title I of the LMRDA to create a panoply of rights to which all persons injured in some way relating to a union may turn when seeking redress."). The mere fact that the maximum was imposed is insufficient, without more, to create an inference of retaliation.

Therefore, because the undisputed evidence here shows that the Board disciplined Milne based on unrebutted testimony from which threatening a union member and his family was a fair inference, and Milne has not provided any evidence of a causal connection between the fine imposed by the Board and any of his other activities, the Union is entitled to summary judgment on Milne's § 529 retaliation claim.

## III. CONCLUSION

For the reasons set forth above, Milne's motion for summary judgment on Count One [Doc. # 31] is GRANTED. The Union's motion for summary judgment [Doc. # 19] is DENIED IN PART AND GRANTED IN PART.

Remaining for trial is whether Milne suffered any injury as a proximate result of defendant's due process violation and what damages or other relief he is thereby entitled to.

IT IS SO ORDERED.